IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 3, 2008

Charles R. Fulbruge III
Clerk

No. 05-20706

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

WILLIAM E. CALDERON-LOPEZ; JUAN CARLOS MARTINEZ-ORDONEZ;
VICTOR VICTORIA-MAGDALANO; ARMANDO GAONA; and RAFAEL E.
RIVAS-LOPEZ

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas
4:04-CR-145-3

Before REAVLEY, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

This case involves a complex conspiracy to transport, harbor, and hold
hostage illegal aliens for pecuniary gain. Each defendant challenges varying
aspects of his conviction and/or sentence. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

## I. BACKGROUND FACTS

On December 13, 2004, a superseding indictment was filed charging William Calderon-Lopez ("Calderon"), Juan Carlos Martinez-Ordonez ("Martinez"), Victor Victoria-Magdalano ("Victoria"), Armando Gaona ("Gaona"), Rafael Rivas-Lopez ("Rivas"), and Zabdiel Hernandez-Bonilla ("Hernandez")[1] with one count (Count 1) of conspiracy to commit hostage taking in violation of 18 U.S.C. § 1203(a); four counts (Counts 2-5) of hostage taking in violation of 18 U.S.C. § 1203(a) and 2; four counts (Counts 6-9) of aiding and abetting the harboring of illegal aliens for the purpose of commercial advantage and private financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(B)(i), and 1324(a)(1)(A)(v)(II); and four counts (Counts 10-13) of aiding and abetting the transportation of illegal aliens for the purpose of commercial advantage and private financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(B)(i), and 1324(a)(1)(A)(v)(II).[2]

The scheme consisted of smuggling illegal aliens across the Mexican border and then holding them hostage until they could secure the smuggling fee from family members. At trial, Special Agent Eleazar Perez, acting supervisor for the alien smuggling unit with the United States Bureau of Immigration and Customs Enforcement ("ICE"), testified that he received information from the Houston Police Department on March 11, 2004 that aliens were being held hostage at the GNW Audio Accessory Shop, located in Houston, Texas. SA Perez reported this information to the Immigration and Naturalization Service ("INS") office. Approximately six federal agents and several Houston police officers were

---

[1] Hernandez pleaded guilty to the conspiracy charge and testified as a Government witness.

[2] The victim aliens named in the indictment are Juan Contreras-Lopez ("Contreras") (Counts 2, 6, and 10); Josue Antonio Vaquedano ("Vaquedano") (Counts 3, 7, and 11); Walter Monrroy-Euseda ("Monrroy") (Counts 4, 8, and 12); and Wilson Hernandez-Contreras ("Hernandez-Contreras") (Counts 5, 9, and 13).

dispatched to the location. During surveillance, the agents observed Calderon leaving the shop and approaching a parked vehicle. The agents observed Gaona and a female sitting inside the vehicle. Gaona told SA Perez that he came to pick up someone to take them to lunch or breakfast. He provided the agents with a driver's license that listed his name as "Fernando Ortiz."

SA Perez asked Calderon if he was the owner of the shop. Calderon responded that he was not. The agents and Calderon entered the shop and saw a checkbook and other documents with Calderon's name on them. When confronted with these items, Calderon admitted that he was in charge and gave written consent to search the premises.

Upon entering the shop, the agents could see an open door leading to a warehouse-type area and that people occupied the area. A few individuals ran toward the back. A commotion then erupted and people ran everywhere. To control the situation, the agents had everyone sit down and began asking questions about their immigration status and countries of origin. Thirty-four persons were undocumented aliens recently smuggled into the United States. The agents placed them into federal custody and transported them to an INS location nearby to conduct interviews.

Special Agent Kenneth Wayne Masters provided the jury with a diagram of the shop that laid out the areas where specific pieces of evidence were discovered. For example, the agents seized a pair of handcuffs, three "pollo"[3] lists, which were described as ledgers listing the names of smuggled aliens, the dollar amounts owed, and telephone numbers for the aliens' contact person who would pay the additional smuggling fee. Special Agent Jeff Hudson testified that some of the aliens taken into federal custody were named on the pollo lists. The agents also discovered a loaded Raven .25-APC caliber pistol and a loaded

---

[3] "Pollo" means chicken in Spanish. In the smuggling context, smugglers are generally known as "coyotes" and the people being smuggled are generally known as "pollos."

Tec-9 submachine gun, along with several rounds of ammunition. Latent fingerprints found on the pollo lists belonged to Martinez, Rivas, and Hernandez.

SA Hudson testified that approximately 34 undocumented aliens were detained at his request; that all defense lawyers were given an opportunity to interview them; that approximately sixteen aliens were detained for deposition; and that five depositions were actually taken, four of which were material witnesses for the United States and one on behalf of one of the defendants. After the depositions were taken, the aliens were processed through ICE and deported. SA Hudson attempted to secure the return of these aliens to testify at trial, but was unable to do so.

Indicted co-defendant Hernandez testified on behalf of the Government. He indicated that he and a friend illegally entered the United States toward the end of January 2004. He was told at the border that the smuggling fee would be paid in the United States and that the fee would be $1,500, though in Houston, the fee increased to $2,000. Upon crossing into the United States, his group met with a "walker," later identified to be Victoria. The group walked through the brush for two days and were then transported to Houston in a car driven by an unidentified person. Hernandez was dropped off in Houston at one location and then picked up by Calderon and eventually driven to the shop. He was at the shop for about one month and fifteen days before his arrest. He testified that Calderon told him when they were arrested that if he kept silent, Calderon would bring him back into the United States for free.

Hernandez testified that he was "locked in" and was "a prisoner for a week or longer" during his first week in Houston. He was told that if no one would pay for him, "they were going to give me a 'pa vajo,'" which he interpreted to mean that he would be "taken down." He also testified that a similar threat was made to another alien and "then they took him out and I don't know what happened with him." Because he could not get the money to pay the smuggling

fee, Hernandez became involved in the conspiracy. He agreed to work for an indefinite period of time and had free roam in the shop, though he was not permitted to leave the premises. He described his role as watching the aliens so they would not create a disturbance. He wrote down the names of family members and telephone numbers. He heard people making calls to family members and stating that the fee was $2,000. He testified that the aliens were "bothered because they had collected the 1,500 and they could not get the 2,000."

Hernandez identified Rivas and Martinez as the persons who wrote down names, phone numbers, and amounts owed, and made telephone calls. He described Victoria as working with Calderon and Gaona. According to him, Calderon and Gaona appeared to be in charge and Calderon would hand any collected money over to Gaona. Hernandez testified that Calderon would wave his gun and make threatening gestures to the aliens and on one occasion, told the aliens, "if anybody tried to escape, he [Calderon] was going to put a bullet in their body." He also testified that Martinez and another smuggler carried weapons. Hernandez also carried a pistol and took turns guarding the aliens. He received his orders from Calderon, who told him that he should threaten the aliens with the gun if they became "boisterous" or "unruly." On one occasion, when the aliens became unruly, Calderon called Gaona, who arrived with a weapon. Hernandez testified that one illegal alien, Contreras, did not have anyone to pay the smuggling fee for him and that he:

> wanted to be sent back to the border, he wanted to be thrown back, and since he was already desperate, William [Calderon] said that he was going to have someone call a person that was called "El Toro" [Gaona] that he knew martial arts, that he knew boxing so that he could put him in his place.[4]

---

[4] Hernandez also testified about an incident involving Contreras and another alien, Monrroy, in which he witnessed Contreras pull down Monrroy's pants near the back of the shop. Hernandez perceived the incident as a sexual-type encounter and saw Monrroy hit Contreras with his fists. Hernandez related this information to Victoria and Gaona the

The four victim aliens named in the indictment testified through video deposition: Contreras, Monrroy, Vaquedano, and Hernandez-Contreras. Prior to playing the videotapes, the district court made a factual finding that at each deposition all "parties were present and represented by counsel."

The deposition testimony of Contreras, Monrroy, Vaquedano, and Hernandez-Contreras indicates that each were part of a group that entered the United States illegally and that Victoria guided them through the brush. Contreras testified that, after entering the United States, he was locked up with approximately 70 other illegal aliens in a house close to the border. Monrroy testified that there were approximately 50 aliens at the house when he arrived. He heard Victoria given an instruction over the telephone to send a van to drive the group to Houston. Each alien was placed into the van "some lying on top of others, some under the seat and some lying on top of the seat. And one was seated up at the front." Victoria then drove the aliens to Houston. Vaquedano and Hernandez-Contreras were taken directly to the shop. Contreras and Monrroy were transported to a different location for a few days and then taken to the shop. During this time at the separate location, Martinez and five other unidentified people watched over the group.

Monrroy, Vaquedano, and Hernandez-Contreras testified that upon arriving at the shop, they were told that the smuggling fee had increased. Upon arrival, Martinez instructed the aliens to "give them our telephone numbers to

---

following morning. He then saw Victoria and Gaona kick and hit Contreras. He testified that after the beating, Contreras could not eat or swallow. Contreras and Hernandez-Contreras corroborated Hernandez's testimony and testified that Victoria and Gaona beat Contreras because he could not pay the smuggling fee. The defendants argued that Victoria and Gaona beat Contreras to protect Monrroy from a future sexual assault. However, Contreras testified that he did not attempt to sexually assault Monrroy and Monrroy testified that Contreras pulled down his pants as a joke. Monrroy equivocated about whether Gaona and Victoria beat Contreras to protect him from a future sexual assault, but he did state that after the beating, Gaona and Victoria told Contreras, "You have that money ready by Monday, or I'm going to put you down[;]" and that "they didn't want him there anymore because he had been there too many days."

make the phone calls . . . so that we could get out of where they were holding us." Both Monrroy and Vaquedano identified Hernandez, Martinez, and Rivas as the persons asking for numbers and making the calls. Hernandez-Contreras identified Rivas and Hernandez as the persons making the calls. He gave his cousin's number to Hernandez and then heard Hernandez ask for money over the telephone. When Contreras arrived, Martinez told him to call a relative for money. Contreras gave Martinez his brother's number and then heard Martinez make this call: "[H]e said to send the money as soon as possible and they were giving us two days' time."

Contreras, Monrroy, Vaquedano, and Hernandez-Contreras testified that they were held captive at the shop and that the smugglers threatened to harm them if they tried to escape. Contreras testified that Martinez and Hernandez held weapons and that Victoria and Hernandez made threats. He identified Gaona as threatening "to put us down" if they could not get the additional money, which he was told meant that "they were going to kill us." Monrroy testified that Rivas and Hernandez received his group and that he understood that if he did not pay, he could not leave. He further testified that Hernandez held a weapon and that Martinez, Rivas, Victoria, and Hernandez were all present when threats to kill were made. Upon his arrest, Rivas told him "to not say anything" and "only to say that we didn't have anything to say." He indicated a reluctance to testify because Martinez had the telephone numbers of his relatives. Vaquedano testified that Victoria, Martinez, and Gaona made threats and that Calderon, Martinez, Rivas, and Hernandez would switch using weapons. According to him, the aliens were told to pay "so that we could get out of where they were holding us" and that if they could not get the money, "we wouldn't be let go." Hernandez-Contreras testified that the smugglers took his shoes and shirt to prevent him from escaping and that "[w]e absolutely could not go in and out." He identified Rivas, Martinez, and Hernandez as the persons

carrying weapons and testified that Rivas and Hernandez specifically threatened to shoot anyone who tried to escape.

On February 4, 2005, the jury returned a verdict of guilty on all counts with respect to Calderon, Victoria, Rivas, and Gaona; and a verdict of guilty on Counts 1-9 with respect Martinez, acquitting him on Counts 10-13. The district court imposed the following sentences:

> Calderon, Victoria, and Rivas: 188 months of imprisonment and a 5-year term of supervised release on Counts 1-5; 120 months of imprisonment and a 3-year term of supervised release on Counts 6-9; and 120 months of imprisonment and a 3-year term of supervised release on Counts 10-13; all to run concurrently.

> Martinez: 188 months of imprisonment and a 5-year term of supervised release on Counts 1-5; and 120 months of imprisonment and a 3-year term of supervised release on Counts 6-9; all to run concurrently.

> Gaona: 324 months of imprisonment and a 5-year term of supervised release on Counts 1-5; 120 months of imprisonment and a 3-year term of supervised release on Counts 6-9; and 120 months of imprisonment and a 3-year term of supervised release on Counts 10-13; all to run concurrently.

Each defendant filed a timely notice of appeal challenging varying aspects of his conviction and/or sentence.

## II. ANALYSIS

### A. Sufficiency of the Evidence Issues

Calderon, Martinez, and Rivas argue that the evidence is insufficient to support their convictions for conspiracy to commit a hostage taking (Count One) and aiding and abetting a hostage taking (Counts 2-5). Calderon additionally argues that the evidence is insufficient to support his conviction for aiding and abetting the transportation and harboring of illegal aliens for the purpose of commercial advantage and private financial gain (Counts 6-13).

This court must affirm a conviction if the evidence, viewed in the light most favorable to the verdict, with all reasonable inferences and credibility choices made in support of it, is such that a trier of fact reasonably could have found the essential elements of the crime beyond a reasonable doubt. United States v. Ramirez, 954 F.2d 1035, 1039 (5th Cir. 1992). Our inquiry is not whether the verdict is correct, but whether the jury reasonably could have made its decision based upon the record evidence. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995). "[T]he standard remains the same whether the evidence is direct or circumstantial." United States v. Ibarra-Zelaya, 465 F.3d 596, 603 (5th Cir. 2006).

### 1. The Hostage Taking Act

Calderon, Martinez, and Rivas were each charged with conspiracy to commit a hostage taking and aiding and abetting a hostage taking. See 18 U.S.C. § 1203(a). To prove the offense of hostage taking, the Government must establish that the defendants "(1) seized or detained another person, and (2) threatened to kill, injure, or continue to detain that person, (3) with the purpose of compelling a third person or entity to act in some way as an 'explicit or implicit condition for the release of the person detained.'" Ibarra-Zelaya, 465 F.3d at 602 (quoting 18 U.S.C. § 1203(a)). "Conspiracy requires direct or indirect agreement to commit hostage taking, knowledge that the purpose of the agreement was unlawful, and joinder in the agreement to further its unlawful purpose." Id. at 603 (quoting United States v. De Jesus-Batres, 410 F.3d 154, 160 (5th Cir. 2005). To prove the crime of aiding and abetting, the Government must establish that the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed. United States v. Garcia, 242 F.3d 593, 596 (5th Cir. 2001). "Associate" means that the defendant shares in the principal's criminal intent. Jaramillo, 42 F.3d at 923. "Participate" means that

the defendant engages in some affirmative conduct designed to aid the venture or assist the perpetrator of the crime. Id. "The evidence supporting a conspiracy conviction is generally sufficient to support an aiding and abetting conviction as well." Ibarra-Zelaya, 465 F.3d at 603 (quoting United States v. Gonzales, 121 F.3d 928, 936 (5th Cir. 1997)).

With respect to Calderon, the evidence, viewed in the light most favorable to the verdict, tends to show that he owned and managed the shop where the aliens were held hostage. Hernandez specifically testified that Calderon drove him to the shop, that Calderon and Gaona appeared to be in charge, and that Calderon handled money, held a weapon, and threatened to shoot the aliens if they tried to escape. Hernandez also testified that he took orders from Calderon and that Calderon instructed him to threaten the aliens if they became unruly or boisterous. Vaquedano testified that Calderon took turns holding a weapon. With respect to Martinez and Rivas, the evidence, viewed in the light most favorable to the verdict, tends to show that they each wrote down the names and numbers of the aliens and made calls to secure the additional smuggling fees. Latent fingerprints found on the pollo lists belonged to them. Several witnesses testified that they carried weapons. Vaquedano testified that Martinez made threats and Hernandez-Contreras testified that Rivas specifically threatened to shoot anyone who tried to escape. Finally, Monrroy testified that both Martinez and Rivas were each present when threats to kill were made. Based on this evidence, a reasonable jury could have concluded that Calderon, Martinez, and Rivas each conspired to commit a hostage taking and aided and abetted a hostage taking.[5]

---

[5] Although Rivas argues that there was insufficient evidence to sustain his conviction as to all counts, he focuses exclusively on the counts involving conspiracy to commit a hostage taking and aiding and abetting a hostage taking. Thus, with respect to the remaining counts, we deem his insufficiency of the evidence challenge waived for inadequate briefing. See United States v. Freeman, 434 F.3d 369, 374 (5th Cir. 2005).

Calderon, Martinez, and Rivas argue that there is no evidence that any alien was detained or that the smuggling fee increased once the aliens crossed the border. According to them, the aliens voluntarily remained at the shop until the initial smuggling fee was paid. However, Hernandez, Contreras, Monrroy, Vaquedano, and Hernandez-Contreras testified that they were each held captive at the shop and that the smugglers threatened to harm them if they tried to escape. Although the evidence regarding the beating of Contreras was conflicting, the jury could have concluded that Gaona and Victoria beat Contreras simply because he was unable to pay the additional smuggling fee. Moreover, Hernandez, Monrroy, Vaquedano, and Hernandez-Contreras testified that the smuggling fee increased once they arrived in Houston. Based on this evidence, a reasonable jury could have concluded that the aliens were actually detained and that a hostage taking occurred. Finally, Rivas argues that there is no evidence of an intent to compel a third person to act in some way as an explicit or implicit condition for the release of the aliens. However, there is ample evidence in the record that the defendants called various friends and family members of the illegal aliens and requested money as an implicit condition for their release. Again, the sole inquiry is not whether the jury's verdict was ultimately correct but whether the jury made a reasonable decision based upon the evidence introduced at trial. Jaramillo, 42 F.3d at 923.

2. The Transportation and Harboring of Illegal Aliens

Calderon was charged with aiding and abetting the transportation and harboring of illegal aliens for the purpose of commercial advantage and private financial gain. See 18 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(A)(iii). To prove the offense of transporting an illegal alien the Government must establish that "(1) an alien entered or remained in the United States in violation of the law, (2) [the defendant] transported the alien within the United States with intent to further the alien's unlawful presence, and (3) [the defendant] knew or recklessly

11

disregarded the fact that the alien was in the country in violation of the law." United States v. Nolasco-Rosas, 286 F.3d 762, 765 (5th Cir. 2002) (citing 8 U.S.C. § 1324(a)(1)(A)(ii) and United States v. Diaz, 936 F.2d 786, 788 (5th Cir. 1991)). To prove the offense of harboring an illegal alien the Government must establish that "(1) [an] alien entered or remained in the United States in violation of the law, (2) the defendant concealed, harbored or sheltered the alien in the United States, (3) the defendant knew or recklessly disregarded that the alien entered or remained in the United States in violation of the law, and (4) the defendant's conduct tended to substantially facilitate the alien remaining in the United States illegally." De Jesus-Batres, 410 F.3d at 160; see also 18 U.S.C. § 1324(a)(1)(A)(iii). Circumstantial evidence alone can establish a defendant's knowledge or reckless disregard that the people being transported and/or harbored are in the United States illegally . See id. at 161 (citing United States v. Rubio-Gonzalez, 674 F.2d 1067, 1071 (5th Cir. 1982)).

Here, there is no dispute that illegal aliens had entered the United States, were transported and harbored in the United States, and that Calderon knew or recklessly disregarded that the transported and harbored aliens entered or remained in the United States in violation of the law. Instead, Calderon argues that there is no evidence that he specifically transported or harbored an illegal alien. However, the evidence, viewed in the light most favorable to the verdict, tends to show that Calderon owned and managed the shop where the aliens were held hostage. Hernandez specifically testified that Calderon drove him to the shop, that Calderon and Gaona appeared to be in charge, and that Calderon handled money, held a weapon, and threatened to shoot the aliens if they tried to escape. Hernandez further testified that he took orders from Calderon and that Calderon instructed him to threaten the aliens if they became unruly or boisterous. Vaquedano testified that Calderon took turns holding a weapon. Based on this evidence, a reasonable jury could have concluded that Calderon

12

aided and abetted the harboring of illegal aliens. Although there is no evidence that Calderon specifically transported Contreras, Monrroy, Vaquedano, and Hernandez-Contreras, a reasonable jury could have concluded that by managing the place to which the aliens were transported, substantially participating in the overall hostage taking conspiracy, and, according to Hernandez, being in charge of the operation with Gaona, Calderon aided and abetted the transportation of illegal aliens to the shop. We understand that most of this evidence comes from the testimony of an indicted co-defendant. However, when evaluating whether the evidence is sufficient to support a jury verdict, we are required to view all of the evidence -- including the testimony of a potentially biased witness -- in a light most favorable to that verdict. See Ramirez, 954 F.2d at 1039.

B. Sixth Amendment Issues

Calderon and Rivas argue that the district court violated their Sixth Amendment confrontation rights by permitting the use of video deposition testimony in lieu of live testimony. Rivas argues that the district court violated his Sixth Amendment confrontation right by limiting his cross-examination of SA Hudson. Finally, Gaona argues that the Government violated his Sixth Amendment confrontation right and right to compulsory process by deporting material alien witnesses.

We review alleged violations of a defendant's Sixth Amendment confrontation right de novo. United States v. Bell, 367 F.3d 452, 465 (5th Cir. 2004). We also review alleged violations of a defendant's Sixth Amendment right to compulsory process de novo. See United States v. Soape, 169 F.3d 257, 267 (5th Cir. 1999). Such claims, however, are subject to harmless error review. See Bell, 367 F.3d at 465; United States v. Jimenez, 464 F.3d 555, 558 (5th Cir. 2006). If there is no constitutional violation, then we review a district court's limitations on cross-examination for an abuse of discretion, which requires a

showing that the limitations were clearly prejudicial.  Jimenez, 464 F.3d at 558-59 (citing United States v. Restivo, 8 F.3d 274, 278 (5th Cir. 1993)).

### 1. The Use of Videotaped Deposition Testimony

Calderon and Rivas argue that the district court violated their Sixth Amendment confrontation rights by permitting the use of video deposition testimony in lieu of live testimony.  According to Title 8 of the United States Code, Section 1324(d):

> Notwithstanding any provision of the Federal Rules of Evidence, the videotaped (or otherwise audiovisually preserved) deposition of a witness to a violation of subsection (a) who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for that violation if the witness was available for cross examination and the deposition otherwise complies with the Federal Rules of Evidence.

We have held that "this provision must be read in conjunction with other rules governing the admission of deposition testimony in a criminal proceeding." United States v. Aguilar-Tamayo, 300 F.3d 562, 565 (5th Cir. 2002).  Rule 15(e) of the Federal Rules of Criminal Procedure provides that deposition testimony "so far as [it is] otherwise admissible under the rules of evidence, may be used if the witness is unavailable, as unavailability is defined in Rule 804(a) of the Federal Rules of Evidence."  Rule 804(a)(5) of the Federal Rules of Evidence defines "unavailability" as being "absent from the hearing and the proponent of [his] statement has been unable to procure [his] presence by process or other reasonable means."  We have emphasized that "[u]navailability must ordinarily also be established to satisfy the requirements of the Confrontation Clause, which generally does not allow admission of testimony where the defendant is unable to confront the witness at trial." Aguilar-Tamayo, 300 F.3d at 565 (citing Ohio v. Roberts, 448 U.S. 56 (1980)).  However, this rule is not absolute and the lengths to which the Government must go to secure a witness to establish his or

her unavailability is a question of reasonableness. Roberts, 448 U.S. at 74. The Government need not make futile efforts to secure the presence of a witness at trial. Id. Instead, "[t]he ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." Id. The burden of proof rests with the Government. Id. at 74-75.

We have previously found reasonable the following measures taken by the Government to secure the presence of a deported witness: (1) giving the witness the option of remaining in the United States with work permits; (2) providing witness fees and travel cost reimbursements; (3) giving the witness a subpoena and letter to facilitate his or her reentry into the United States; (4) calling the witness in his or her home country; (5) getting repeated assurance from the witness that he or she would return; (6) apprising border inspectors of the witness's expected arrival into the United States; and (7) issuing checks to be given to the witness upon his or her reentry into the United States. United States v. Allie, 978 F.2d 1401, 1407 (5th Cir. 1992). We have further recognized that the Government need not take all of these steps to establish that it acted reasonably to secure a witness's presence. Aguilar-Tamayo, 300 F.3d at 566.

Here, SA Hudson filed an affidavit indicating the efforts made to secure the presence of Contreras, Vaquedano, Monrroy, and Hernandez-Contreras for trial. Specifically, SA Hudson issued subpoenas and letters to each witness translated into Spanish indicating the trial date and that the witness might be required to testify at trial. The letters also provided explicit instructions for obtaining the necessary documents to enter the United States and provided each witness with the travel distance to the American Embassy from his respective place of residence, along with the addresses and telephone numbers for the American Embassies located in Mexico and Honduras. SA Hudson further informed each witness that the Government would pay for the trip and reimburse the witness for any other incidental travel needed for the purpose of

testifying. SA Hudson provided Contreras with a contact number, but Contreras failed to contact SA Hudson after his deportation. SA Hudson made several attempts to contact Vaquedano, but failed to locate him in Mexico. With respect to Monrroy and Hernandez-Contreras, SA Hudson remained in contact with them and requested Significant Public Benefit Paroles in order to facilitate their reentry into the United States. However, Monrroy refused to testify unless he could stay in the United States permanently and Hernandez-Contreras simply failed to show up. Based on these good-faith efforts, we agree that the Government made reasonable attempts to secure the presence of each witness at trial sufficient to satisfy the Confrontation Clause.[6]

Rivas argues that the use of the videotaped deposition testimony violated the Confrontation Clause because the defendants did not have an opportunity to cross-examine the deported witnesses on the issue of hostage taking. On the day that the first deposition was taken, the Government notified the defendants that "[it] will be superseding the indictment to include hostage taking. It won't include all defendants, but it will probably include most of them. So you may want to take that into consideration in your questioning." Although providing notice on the day of the first deposition that a superseding indictment will be filed to include a new count that might involve a particular defendant is not necessarily ideal, we agree with the district court that the defendants were nonetheless able to evaluate to what extent each deponent's testimony would implicate them with regard to a potential hostage taking count and cross-examine each witness on that issue. Indeed, the defendants were able to elicit favorable evidence from the deponents regarding that very issue. Moreover, the

---

[6] With respect to Calderon, even if we did find a Confrontation Clause violation, any such error was harmless beyond a reasonable doubt. Indeed, almost all of the evidence implicating Calderon came through the testimony of indicted co-defendant Hernandez, who provided live testimony before the jury and was subject to cross-examination. Thus, the videotaped deposition testimony was not even material to Calderon and, at best, provided cumulative evidence. See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

deponents were deported more than a month after the first superseding indictment was filed on June 10, 2004. The defendants could have easily requested that the district court order that these witnesses be deposed a second time in light of the new charges and failed to do so.[7]

2. The Limitations on the Cross-Examination of SA Hudson

Rivas argues that the district court violated his Sixth Amendment confrontation right by limiting his cross-examination of SA Hudson. "While the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." United States v. Elliott, 571 F.2d 880, 908 (5th Cir. 1978).[8] This right "is particularly important when the witness is critical to the prosecution's case." Jimenez, 464 F.3d at 559 (quoting United States v. Mizell, 88 F.3d 288, 293 (5th Cir. 1996)). However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original); see also Bigby v. Dretke, 402 F.3d 551, 573 (5th Cir. 2005) ("[T]he Confrontation Clause does not guarantee defendants cross-examination to whatever extent they desire."). The district court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment,

---

[7] Rivas also argues that the videotapes were facially deficient because they did not always function properly and the audio and visual were not always synchronized. We see no reason to disturb the district court's finding that any lack of synchronization was inconsequential and thus, did not somehow implicate the Confrontation Clause.

[8] The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. Thus, the Confrontation Clause is generally satisfied when the defendant has been "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." Restivo, 8 F.3d at 278 (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).

In order to establish a violation of the confrontation right, the defendant need not establish that the jury would have reached a different result. Van Arsdall, 475 U.S. at 679-80. Instead, the focus is on the particular witness. Id. at 680. Thus, to establish a violation of the confrontation right, the defendant need only establish that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." Id. Finally, any violation of the confrontation right is subject to harmless error review by analyzing the following factors: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id. at 684.

Rivas attempted to cross-examine SA Hudson regarding written notes taken during interviews of the remaining illegal aliens found at the shop but not deposed. The purpose of this line of questioning was to illustrate that none of the remaining illegal aliens identified Rivas. The district court sustained an objection to this line of questioning because SA Hudson did conduct all of the interviews and did not prepare the written notes; it would be hearsay for SA Hudson to testify as to whether the remaining illegal aliens identified or failed to identify Rivas during their interviews; and the proffered evidence was hardly

exculpatory because it did not negate the fact that three alien witnesses specifically identified Rivas. The district court nonetheless permitted Rivas to elicit testimony that all of the illegal aliens were interviewed, certain aliens misidentified a defendant when viewing the photo spread, that the aliens were subsequently deported, and that a handwriting expert failed to match Rivas's handwriting with the handwriting contained in the pollo lists. In so doing, we agree that the district court imposed reasonable limitations on the cross-examination of SA Hudson sufficient to comport with the Federal Rules of Evidence and the Confrontation Clause. See Van Arsdall, 475 U.S. at 679. We further agree that these limitations did not constitute an abuse of discretion. Jimenez, 464 F.3d at 558-59 (citing Restivo, 8 F.3d at 278).

### 3. The Deportation of Material Witnesses

Gaona argues that the Government violated his Sixth Amendment confrontation right and right to compulsory process by deporting material alien witnesses. The Sixth Amendment guarantees a criminal defendant the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The mere fact that the Government deported a material witness, standing alone, is insufficient to establish a violation of the right to compulsory process. United States v. Gonzales, 436 F.3d 560, 578 (5th Cir. 2006). Instead, to establish such a violation, the defendant must "make[] a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982). This court has not addressed the issue of whether the defendant must also establish that the Government deported the witness in bad faith. See Gonzales, 436 F.3d at 578 (declining to address the issue).[9] We need not do so

---

[9] The Seventh, Ninth, and Tenth Circuits have held that the defendant must establish that the Government acted in bad faith in deporting a witness to establish a violation of the

today because even if Gaona established that the Government acted in bad faith, he has made no attempt to establish that any of the deported alien witnesses would have been material and favorable to his defense.

Gaona argues that he was not given a sufficient opportunity to interview these witnesses to determine whether they would have provided favorable material evidence. However, the record belies this argument. In fact, Gaona concedes that he was able to interview several of these witnesses. If the ten-day time frame allotted by the district court was insufficient to interview all of them, he could have easily requested the district court to temporarily detain the remaining aliens until he had an opportunity to interview them. Indeed, the district court granted a similar request by Victoria to temporarily detain nine aliens until the completion of trial or until further order from the district court. Nonetheless, because Gaona has failed to establish that any of the deported alien witnesses would have been material and favorable to his defense after having an opportunity to collect such information, we reject his argument that the Government violated his Sixth Amendment confrontation right and right to compulsory process by subsequently deporting these aliens. See United States v. Villanueva, 408 F.3d 193, 200-01 (5th Cir. 2005).

C. Sentencing Issues

### 1. Substantive Reasonableness

Martinez and Rivas challenge the reasonableness of their sentences, both of which fall within the properly calculated Guidelines ranges for their offenses. This court accords a presumption of reasonableness to sentences that fall within a properly calculated Guidelines range and the Supreme Court has recently upheld this practice. See United States v. Rita, 127 S. Ct. 2456, 2459 (2007);

---

right to compulsory process. See United States v. Chaparro-Alcantara, 226 F.3d 616, 624 (7th Cir. 2000); United States v. Pena-Gutierrez, 222 F.3d 1080, 1085 (9th Cir. 2000); United States v. Iribe-Perez, 129 F.3d 1167, 1173 (10th Cir. 1997).

United States v. Alonzo, 435 F.3d 551, 554 (5th Cir. 2006). The Supreme Court has also recently reiterated that "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard." Gall v. United States, 128 S. Ct. 586, 591 (2007).

With respect to Martinez, the district court granted his objection to the six-level ransom enhancement under U.S.S.G. § 2A4.1(b), leaving a Guidelines range of 188-235 months. The district court considered the Guidelines range and then sentenced Martinez to 188 months' imprisonment, finding that a sentence at the lower end of that range "is consistent with . . . the factors identified in 18 U.S.C. § 3553(a)." Martinez argues that his sentence is "extraordinarily" unreasonable in comparison to the applicable Guidelines ranges for the offenses of alien smuggling and aggravated assault. However, Martinez was not found guilty of alien smuggling or aggravated assault; he was found guilty of hostage taking and there is no suggestion that the district court improperly calculated the Guidelines range for this offense. Martinez contends that this particular hostage taking was less serious than the typical hostage taking scenario. The district court appeared to be sympathetic to this argument by granting Martinez's objection to the ransom enhancement and sentencing him at the lower end of the Guidelines range. In doing so, we are unable to say that the sentenced imposed is unreasonable or that the district court abused its discretion, especially given the presumption of reasonableness afforded to sentences that fall within a properly calculated Guidelines range.

With respect to Rivas, he challenges only the "presumptive reasonableness" of his sentence. However, both the Supreme Court and this court have upheld the use of a presumption of reasonableness for sentences that fall within a properly calculated Guidelines range. Rita, 127 S. Ct. at 2459; Alonzo, 435 F.3d at 554. Thus, this argument lacks merit.

## 2. Downward Departure for Minor Participation

Victoria argues that the district court erred in failing to apply a two-level downward adjustment for his minor participation in the offense of conviction. See USSG § 3B1.2(b). We review such factual determinations for clear error. Villaneuva, 408 F.3d at 203. "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." Id. (citing United States v. Valencia, 44 F.3d 269, 272 (5th Cir. 1995)).

Section 3B1.2 only applies when a defendant is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, cmt. n.3(A). "It is not enough that a defendant 'does less than other participants; in order to qualify as a minor participant, a defendant must have been peripheral to the advancement of the illicit activity.'" Villaneuva, 408 F.3d at 204 (quoting United States v. Miranda, 248 F.3d 434, 446-47 (5th Cir. 2001)). Victoria's argument that his conduct was merely peripheral to the overall hostage taking conspiracy is not supported by the record evidence. Indeed, Victoria guided the aliens through the brush and then drove them to Houston, Texas. Several witnesses testified that he threatened the aliens at the shop and was present when threats to kill were made. Finally, there was evidence that he participated in beating Contreras because Contreras could not pay the smuggling fee. Thus, we are unable to say that the district court clearly erred in failing to apply the two-level downward adjustment for minor participation in the offense of conviction.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's judgments of conviction and sentences.