**REVISED February 15, 2019**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50465

United States Court of Appeals
Fifth Circuit

**FILED**
December 12, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

GEORGE LAMAR DARRYL FOSTER,

> Defendant – Appellant.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:16-CR-1340-1

Before REAVLEY, ELROD, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

George Lamar Darryl Foster was convicted of transporting aliens for commercial advantage or private financial gain. Foster argues that the introduction of videotaped depositions of two material witnesses at trial violated his rights under the Confrontation Clause because the government

---

[*] Pursuant to Fifth Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Fifth Circuit Rule 47.5.4.

No. 17-50465

failed to demonstrate the witnesses were unavailable. We vacate the judgment and remand for proceedings consistent with this opinion.

I.

Driving a tractor-trailer with a refrigerated unit, Foster attempted to cross the Sierra Blanca checkpoint around midnight on July 7, 2016. Border Patrol agents discovered six persons in the trailer's refrigerated unit, five of whom were undocumented aliens. Two of those aliens were Jose Manuel Francisco-Maldonado and Leandro Hernandez-Ruiz. Everyone relevant to this appeal was arrested. The government charged Foster in a two-count indictment for transporting aliens for commercial advantage or financial gain and conspiracy to do the same.

The government conducted video depositions of Francisco-Maldonado and Hernandez-Ruiz on July 22, 2016, wherein they identified Foster as the person who let them into the trailer. They were cross-examined by defense counsel. During their depositions, the government advised the witnesses they might be needed for trial and, if so, that the government would allow them to reenter the United States and would pay for their travel expenses. The witnesses were asked to provide an address and telephone number where they could be reached in Mexico. Hernandez-Ruiz provided a home address and a telephone number. Francisco-Maldonado provided a home address and e-mail address. Both testified under oath that they would return for Foster's trial and that they would update their contact information if it changed. In exchange for their testimony, the government agreed to drop all criminal charges against them. Francisco-Maldonado and Hernandez-Ruiz were either released or deported later that day.[1]

---

[1] As the government concedes, it is unclear whether the witnesses "departed the United States pursuant to deportation, removal, or voluntary departure." At oral argument,

No. 17-50465

On November 7, 2016, the district court issued an order setting Foster's case for trial.[2] The week before trial, the government filed a motion to declare Francisco-Maldonado and Hernandez-Ruiz unavailable and to allow for the introduction of their videotaped depositions at trial. According to the government's motion, the agent assigned to Foster's case began attempts to contact Francisco-Maldonado and Hernandez-Ruiz the day after the district court set Foster's case for trial, and continued those efforts through February 14, 2017, the week before Foster's trial. During that four-month period from November through February, the government stated that it called Hernandez-Ruiz six times, e-mailed Francisco-Maldonado four times, sent a letter to the witnesses' home addresses, and made some attempt to reach out to the Mexican government, as well as to the witnesses' attorney. The government did not attach any documentary evidence in support of the above-mentioned efforts. Nor did the government state that it made any attempt to contact either individual during the three and a half months between their release date in July and the scheduling of the trial in November. A few days prior to trial, the district court granted the government's motion to declare Hernandez-Ruiz and Francisco-Maldonado unavailable.

The trial went as follows: Foster filed a motion to exclude the videotaped depositions on the ground that their introduction would violate his Sixth Amendment right to confrontation because the government failed to demonstrate that the material witnesses were unavailable. Although Foster argued, among other things, that the efforts the government described in its

---

the government indicated Francisco-Maldonado was probably deported, but that it was unsure about Hernandez-Ruiz.

[2] The district court initially set Foster's trial date for January 30, 2017, but later reset the trial for February 27, 2017.

No. 17-50465

motion were "not reflected on the record . . . in any place," the district court accepted the government's factual representations and denied Foster's motion.

The Border Patrol agents who investigated and arrested Foster testified that Foster attempted to drive the tractor-trailer through the checkpoint and that they discovered six individuals inside the trailer's refrigerated unit, two of whom were Francisco-Maldonado and Hernandez-Ruiz. The Special Agent from the U.S. Department of Homeland Security who interviewed Foster upon his arrest testified that Foster initially denied having knowledge that undocumented aliens were in his truck but eventually confessed to transporting them for money. The agent also testified that Foster gave a written statement to this effect. Next, the government presented Francisco-Maldonado and Hernandez-Ruiz's videotaped depositions, and Foster again objected on Confrontation Clause grounds. Testifying in his own defense, Foster claimed that he did not know there were individuals in his trailer and that he gave a written statement only after being threatened and coerced by investigators during the interview.

The jury found Foster guilty of transporting aliens for commercial advantage or private financial gain, but not guilty on the conspiracy count. The district court sentenced Foster to 57 months of imprisonment, to be followed by 2 years of supervised release. Foster timely filed a notice of appeal.

II.

Foster argues that the district court violated his Sixth Amendment confrontation rights by allowing the use of Hernandez-Ruiz's and Francisco-Maldonado's videotaped depositions.[3] We review Confrontation Clause

---

[3] Foster additionally argues that he had an inadequate prior opportunity to cross examine the witnesses. Because we hold the witnesses were not "unavailable" for Confrontation Clause purposes, we do not address this argument.

4

challenges *de novo*, subject to harmless error review. *United States v. Tirado-Tirado*, 563 F.3d 117, 122 (5th Cir. 2009).

The Confrontation Clause affords criminal defendants the right "to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. The Supreme Court has explained that the Confrontation Clause contemplates

> a personal examination and cross examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Ohio v. Roberts*, 448 U.S. 56, 63–64 (1980) (*overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004)) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43 (1895)). But this right is not absolute. Indeed, "some circumstances justify dispensing with confrontation at trial." *U.S. v. Allie*, 978 F.2d 1401, 1406 (5th Cir. 1992). Out-of-court statements, like a videotaped deposition, "may be introduced against a criminal defendant if the government can 'demonstrate the unavailability of the declarant whose statements it wishes to use.'" *Id.* (quoting *Roberts*, 448 U.S. at 65–66). Our question in this case is whether the government demonstrated that Francisco-Maldonado and Hernandez-Ruiz were "unavailable."

### A.

"A witness is 'unavailable' for Confrontation Clause purposes if the 'prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.'" *Id.* (quoting *Roberts*, 448 U.S. at 74). "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." *Tirado-Tirado*, 563 F.3d at 123 (quoting *Roberts*, 448 U.S. at 74) (ellipsis omitted); *see also Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 418 (5th Cir. 1992) ("[D]eposition testimony is admissible only if the government has exhausted

reasonable efforts to assure that the witness will attend trial."). Although "[t]he inevitable question of precisely how much effort is required on the part of the government to reach the level of a 'good faith' and 'reasonable' effort eludes absolute resolution applicable to all cases," it is well established that, "[b]ecause of the importance our constitutional tradition attaches to a defendant's right to confrontation, the 'good faith effort' requirement demands much more than a merely perfunctory effort by the government." *Allie*, 978 F.2d at 1406, 1408.

The facts of this reasonableness inquiry in this specific case place it somewhere in the middle of a spectrum bounded on one end by our precedent in *Allie* (where it was held that the government did make a good faith effort to obtain the presence of deported witnesses) and on the other end by our precedent in *Tirado-Tirado* (where it was held that the government did not make a good faith effort to obtain the presence of deported witnesses).

In *Allie*, we held that the government satisfied the good-faith test because it: (1) gave the witnesses the option of remaining in the United States with work permits until trial; (2) told the witnesses that it would pay for their return travel expenses; (3) issued a subpoena, as well as a letter to assist with reentry; (4) obtained repeated assurances from the witnesses that they would return prior to deportation; (5) remained in contact with the witnesses by calling them in Mexico after the deportation; (6) informed border inspectors of the witnesses' anticipated arrival; and (7) issued checks to be given to the witnesses for travel expenses. 978 F.2d at 1407.

Similarly, in *United States v. Calderon-Lopez*, we found good faith where the government: (1) prior to deportation, issued subpoenas and letters in which apprised the witnesses that they might be required to appear at trial; (2) in the letters, provided "explicit instructions" for gaining reentry; (3) informed the witnesses that it would cover travel-related expenses; (4) provided contact

No. 17-50465

information; and (5) following deportation, made several attempts to contact the witnesses and remained in contact with two of them. 268 F. App'x 279, 289 (5th Cir. 2008) (unpublished).

On the other end of the spectrum, in *Tirado-Tirado*, the government's efforts did not meet the good-faith effort standard. Prior to deportation, the government failed to make any concrete arrangements for the witness to return, only orally informing the witness that his testimony would be required if the case went to trial. 563 F.3d at 124. Furthermore, the government did not serve the witness with a subpoena to assist in his reentry, and it did not make any attempt to contact until more than five months after his deposition. *Id.* at 124. Only eight days before the trial was scheduled to commence did the government attempt to contact the deported witness.  During those eight days the government attempted to reach the witness by phone, by letter, by contacting the witness's family members, by reviewing call logs from the witness's phone at the time of his arrest to identify potential leads, by checking immigration and criminal records, and by subpoenaed financial records for transactions made in the witness's name. Although we noted these efforts were "fairly exhaustive," we nevertheless concluded the government did not meet its good-faith burden because the efforts "were made at the last minute and followed a long period during which the government apparently made no effort to remain in contact with [the witness]." *Id.* at 125.

We reached the same result in *United States v. Guadian-Salazar*, 824 F.2d 344 (5th Cir. 1987). After the government deposed the witnesses in that case, it took them to the Mexican border, served them with subpoenas printed in English only and a notice stating that, if their testimony was needed for trial, the government would "make provisions for [them] to legally enter the United States and to remain until the case is terminated." *Id.* at 346. Although the government's agent provided his contact information and instructed the

7

witnesses to meet him at a specific port of entry on a specific date, the government did not advance the witnesses any travel funds and did not await the witnesses' arrival at the agreed-upon port of entry. *Id.* In that case, we accepted the government's concession that the use of videotaped deposition testimony violated the defendant's right to confrontation. *Id.* at 347.

In this case, under the totality of circumstances presented on the record before us, we hold that the government's efforts to secure the presence of Hernandez-Ruiz and Francisco-Maldonado for trial was closer to the efforts in *Tirado-Tirado* than to those in *Allie*, and the government therefore did not meet the good-faith standard to establish the unavailability of the witnesses.

The government notes that deporting a material witness before trial may nevertheless be consistent with good faith efforts. This is true, and we recognize that the government may sometimes have competing obligations between enforcing immigration laws and ensuring criminal defendants receive the protections provided for them under the Sixth Amendment. Nonetheless, *if* the government elects to deport a witness prior to trial, and *if* it wants to use that deported witness's testimony in the trial, *then* it should undertake reasonable measures, under the circumstances, that are likely to ensure that the witness will return for trial. The Constitution permits nothing less.

In this case, the government made no attempt to verify or confirm the authenticity or workability of the witnesses' contact information, nor did the government make any attempt to obtain additional collateral contact information. Instead, the government merely informed Hernandez-Ruiz and Francisco-Maldonado that their testimony might be needed if Foster's case went to trial, and that it would take care of travel arrangements if that turned out to be the case. Furthermore, after the government released or deported the witnesses, it failed to even make an attempt to remain in contact with them for over three months. Each of the above-mentioned factors, standing alone,

may not demonstrate a lack of good faith or reasonable effort in all cases. The lengths to which the government must go to produce a witness is a question of reasonableness that will vary from case to case.  In this case, however, the government's efforts, when taken in the aggregate, were not reasonably sufficient to procure the availability of the witnesses at trial.

To be sure, some of the government's conduct was indicative of a good-faith effort to secure the witnesses' physical presence, such as telling the witnesses that the government would cover travel-related costs and exchanging contact information. But those efforts do not remedy the harm done in this case by deporting the material witnesses without verifying their contact information or even attempting to remain in contact for more than three months. Under these circumstances, the government virtually assured the absence of Hernandez-Ruiz and Francisco-Maldonado from trial, and their videotaped depositions should not have been admitted. "The right of confrontation may not be dispensed with so lightly." *Barber v. Page*, 390 U.S. 719, 725 (1968).

## B.

We must also note the problems presented by the government's failure to provide evidentiary support for many of the measures it claims to have undertaken. In its motion to declare the material witnesses unavailable, the government represented that it sent e-mails and letters, made phone calls, and sought help from the Mexican government and the witnesses' attorney. But there is not a shred of evidence documenting these measures: The record contains no copies of the e-mails, letters, or other correspondence the government purportedly sent, nor is there any catalog of phone records. We have previously questioned the propriety of relying on such representations in the unavailability context. *See United States v. Acosta-Ruiz*, 481 F. App'x 213, 217 n.3 (5th Cir. 2012) (unpublished) ("Although we do not reach the issue of

whether the Government can rely on the representations of its attorney to establish its good faith in procuring a witness's testimony for Confrontation Clause purposes, we note that such reliance is extremely disfavored.").

We thus again take the opportunity to question the government's reliance on the unsworn representations of its attorney to establish good faith for purposes of the Confrontation Clause. As noted in *Acosta-Ruiz*, given that our review is *de novo* and the good-faith inquiry is inherently fact-bound and turns on reasonableness, the lack of such documentary evidence presents "great practical difficulties for us as a reviewing court." *Id.* After all, the government's burden is an evidentiary one, so it only makes sense to require the government to produce evidence in support of its efforts. *See Roberts*, 448 U.S. at 74–75 ("As with other evidentiary proponents, the prosecution bears the burden of establishing [unavailability].").

We have eschewed reliance on such unsworn assertions in both the sentencing and speedy-trial contexts. *See United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007) ("The unsworn assertions of the government's attorney do not provide a sufficiently reliable basis for a defendant's sentence."); *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002) ("The Government argued in its opposition that it was diligent, offering reasons for its delay and explaining efforts to track Cardona down, but did not support its memorandum with a single shred of evidence then or at the later hearing. . . . The Government's arguments in brief are not evidence."); *see also Skyline Corp. v. Nat'l Labor Relations Bd.*, 613 F.2d 1328, 1337 (5th Cir. 1980) ("Statements by counsel in briefs are not evidence.").

Notwithstanding our serious doubts as to whether the government's unsworn statements are adequate to carry its burden under the Confrontation Clause, we need not answer the question here because the government's pre-

deportation shortcomings and its failure to maintain contact with the material witnesses following their release proves fatal to the government's case.

Having determined that the admission of Hernandez-Ruiz and Francisco-Maldonado's videotaped deposition testimony violated Foster's right to confrontation, we next ask whether the error was harmful.

C.

"A defendant convicted on the basis of constitutionally inadmissible Confrontation Clause evidence is entitled to a new trial unless it was harmless in that there 'there was [no] reasonable possibility that the evidence complained of might have contributed to the conviction.' " *United States v. Alvarado-Valdez,* 521 F.3d 337, 341 (5th Cir. 2008) (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). "The government bears the burden of establishing the error is harmless beyond a reasonable doubt." *Id.*

The government argues that it meets its burden by pointing to other evidence in the record to support conviction, such as the testimony of government agents who were present when Foster attempted to cross the Sierra Blanca checkpoint, as well as Foster's confession. However, the government misunderstands the nature of our harmlessness inquiry here. In the context of a Confrontation Clause violation that arises from the introduction of inadmissible testimony in a direct criminal appeal, "[o]ur focus is on the possibility of harm arising from [the inadmissible testimony] and not necessarily on the possibility of its relationship to other evidence." *Id. See also Lowery v. Collins,* 988 F.2d 1364, 1373 (5th Cir. 1993) (noting that "the reviewing court must concentrate on the evidence that violated [the defendant's] confrontation right, *not the sufficiency of the evidence remaining after excision of the tainted evidence*") (emphasis added).

No. 17-50465

In this case, the government placed significant reliance on the inadmissible testimony when making its closing argument.[4] Even more importantly, however, the *only* evidence that the jury asked to reexamine while it was deliberating concerned the videotaped depositions at issue. The jury specifically asked to re-watch the portion wherein the defendant was identified as the person who let the aliens into the trailer. As such, and notwithstanding all the other evidence introduced at trial suggesting Foster's guilt, the government cannot demonstrate beyond a reasonable doubt that the videotaped depositions at issue here did not contribute to Foster's conviction.

### III.

The judgment is VACATED, and this matter is REMANDED for proceedings consistent with this opinion. We need not address Foster's asserted error concerning the admission of evidence pursuant to Federal Rule of Evidence 404(b), and we do not comment on the sentence.

---

[4] Statements made by the prosecution in its closing argument relating to the videotaped depositions at issue here included:

(1) "Consider the material witnesses, those videotaped interviews and those people saying, Yup, I'm undocumented. I'm not here legally. He was the driver of the vehicle. He waved us into the trailer and we got into the trailer that he was driving."

(2) "One important note that I do need to make to you. After watching the video depositions -- and you have the full video depositions in evidence. All you need to do is ask to view them and ask to read the full video deposition transcripts."

(3) "Please be aware that each witness, video deposition witness, testified alone while the other witness waited in the hallway, just like in court today."

(4) "The first corroboration of the video deposition witness is the fact that their testimony was extremely consistent with one another. They told you the story of how they got in the van, and they both identified the Defendant and explained how the Defendant waved them in."

(5) "Next, did the video deposition witnesses impress you as honest? Remember the first witness, Mr. Francisco Maldonado, the 19-year-old. He seemed to be an intelligent young man and he recalled the events clearly, and he just answered the questions posed to him. Mr. Hernandez-Ruiz, the second witness. He was more of a salt-of-the-earth type of witness. And he told you during his deposition that, You know, what? I'm just a simple field worker."

No. 17-50465

STEPHEN A. HIGGINSON, Circuit Judge, dissenting:

I share the majority's concern that material witnesses who depart the United States before trial may not return to testify. But, as the majority opinion acknowledges, our cases do not require the government to keep witnesses who are foreign nationals in the country until trial. *See United States v. Tirado-Tirado*, 563 F.3d 117, 124–25 (5th Cir. 2009) ("[D]eporting a witness may still be consistent with 'good faith' and 'reasonable' efforts to procure the witnesses' availability at trial."); *United States v. Allie*, 978 F.2d 1401, 1407 (5th Cir. 1992) (refusing "to adopt a *per se* rule" requiring the government "to coercively detain the witnesses in the United States").

In light of this precedent, I cannot agree that the government failed to engage in *good faith* efforts to ensure these foreign national witnesses' availability for trial. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Tirado-Tirado*, 563 F.3d at 123 (quotation omitted). Here, Foster had the opportunity to cross-examine each foreign national witness at his deposition. In addition, the government secured each foreign national's assurances, with counsel present and under oath, that (1) he understood his presence at trial might be required; (2) he agreed to travel to Texas for trial; (3) he had provided the case agent with his contact information; (4) he agreed to update his contact information with his attorney or the case agent if it changed; and (5) he understood that the government would arrange for and pay for his travel back to the United States. Such sworn statements, with counsel present, serve as a vital form of verification in our legal system. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity.").

Thereafter, the government began its efforts to contact the witnesses as soon as the district court set a trial date, and made multiple attempts to reach

13

No. 17-50465

each witness.[1] *Cf. Tirado-Tirado*, 563 F.3d at 125 (explaining that the government should have made arrangements with the witness once the trial date was set, "or at least [sought] to contact him more than one week prior to trial"). Although it may be better practice to remain in continuous contact with material witnesses after they leave the country, the three-and-a-half months that elapsed between the witnesses' depositions and the government's first attempts to contact them was not an unreasonably long period of time.

If the foreign national witnesses were willing to return to the United States to testify, the government's efforts were reasonably calculated to communicate the importance of their testimony and to ensure their presence at trial. If the foreign national witnesses were not willing to return for trial, I am not convinced that taking additional steps to verify their contact information or to reach out to them earlier would have made a difference.

In *United States v. Calderon-Lopez*, 268 F. App'x 279 (5th Cir. 2008), we held that the government made reasonable efforts to secure the presence of four material witnesses at trial even though the witnesses were deported. *Id.* at 282, 289. As the majority opinion emphasizes, the government in that case was able to remain in contact with two of the witnesses. *Id.* at 289. But the government lost contact with the other two witnesses whose video depositions were played at trial. *Id.* at 283–84, 289. Further, unlike in this case, the government does not appear to have secured the witnesses' explicit assurances that they would return for trial. *Id.*; *cf. Allie*, 978 F.2d at 1407 (noting that the government got the witnesses' assurances that they would return to testify).

---

[1] As the majority opinion observes, the only evidence in the record of the government's efforts to contact the witnesses in Mexico comes from the representations of counsel. But Foster did not argue in his brief that these representations are inaccurate or that the district court erred in accepting the government's representations without requiring further documentary evidence.

14

Again, the witnesses here not only made assurances that they would return, but they did so under oath and with counsel present. The majority and I may disagree about whether securing sworn assurances is more or less likely to ensure a witness's presence at trial than attempting to remain in continuous contact with the witness after deportation. But this disagreement does not render the government's approach in this case unreasonable.

Although "[o]ne, in hindsight, may always think of other things" that *could* have been done, and perhaps should have been done, the government must demonstrate only that its efforts satisfied its duty of good faith. *Ohio v. Roberts*, 448 U.S. 56, 75–76 (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004); *see also United States v. Aguilar-Tamayo*, 300 F.3d 562, 566 (5th Cir. 2002) ("We do not suggest that it is necessary for the government to take all of the steps referenced in *Allie* to establish that it acted reasonably to secure a witness' presence."). The district court concluded that it was "satisfied that the Government has made every effort that they can to get these witnesses here, believe me." Because I see no reversible error in this conclusion, I respectfully dissent.