UNITED STATES of America,
Plaintiff–Appellee,

v.

James Vincent AGUILAR,
Defendant–Appellant.

No. 91–8643.

United States Court of Appeals,
Fifth Circuit.

July 14, 1992.

Henry J. Bemporad, Asst. Federal Public Defender, San Antonio, Tex., Lucien B. Campbell, Federal Public Defender, Michael S. McDonald, Asst. Federal Public Defender, El Paso, Tex., for defendant-appellant.

Richard L. Durbin, Jr., David Landel Nichols, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, JONES, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

James Vincent Aguilar (Aguilar) appeals his conviction for seven counts of theft of government property under 18 U.S.C. § 641. In each count, the indictment

charged that Aguilar "willfully and knowingly did steal and purloin U.S. currency and merchandise ... by submitting to the Fort Bliss Post Exchange a personal check which he then well knew would be insufficient." The district court sentenced Aguilar to three years probation on each of the counts, the sentences to run concurrently.

Aguilar contends on appeal that the indictment fails to charge an offense under *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), which holds that a bad check is not a false representation, therefore, obtaining goods by writing bad checks cannot constitute a "wrongful taking" from the Government. We disagree and affirm the conviction as to Counts Two through Seven.

## I. BACKGROUND

Aguilar is the husband of Staff Sergeant Barbara Simmons, stationed at Fort Bliss, Texas. Between May 26, 1990, and June 9, 1990, Aguilar wrote several checks to the Fort Bliss Post Exchange (the "PX") and the post commissary for various amounts, in exchange for goods and cash. The checks were written on an account at the Sunset–Ogden branch of the Bank of America in Los Angeles, California, and at the time they were written, the account had been closed for insufficient funds. According to bank officer Bruce Baker, Aguilar's account had a balance of $8.14 as of January 12, 1990, and the bank did not send him any account statements after January 1990 because his address was invalid, and he left no forwarding address. There was no activity in the account between January and May 1990, and when service charges depleted the balance, the bank closed the account. Aguilar claims he did not learn the account had been closed until after he wrote the insufficient funds checks at issue here.

The seven checks for which Aguilar was indicted were introduced as Government Exhibits 1–A through 1–G. The dates on all the checks correspond to the dates in the indictment, with the exception of the check labeled Exhibit 1–A, referred to in Count One. The date on that check was May 25, 1999. Aguilar contends that reversal is warranted as to Count One because a post-dated check is not payable until the stated date.

18 U.S.C. § 641 provides,

> Whoever embezzles, steals, purloins, or knowingly converts ... any ... money, or thing of value of the United States ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than a year, or both.

Whether an indictment sufficiently alleges the elements of an offense is a question of law to be reviewed *de novo*. *United States v. Shelton*, 937 F.2d 140, 142 (5th Cir.1991).

## II. DID AGUILAR "STEAL" GOVERNMENT PROPERTY?

■ The elements of the offense of theft of government property under § 641 were expressed in the district court's jury instructions:

> In order to establish a violation of this statute, the government must prove beyond a reasonable doubt:
>
> First: That the money or property contained in the indictment belonged to the United States Government and had a value in excess of $100 at the time alleged.
>
> Second: That the defendant stole or converted such money or property for the defendant's own use or for the use of another; and
>
> Third: That the defendant did so knowing the money or property was not his and with the intent to deprive the owner of the use or benefit of the money or property. Record Vol. 2, p. 99.

The district court defined the term "steal" as "the wrongful taking of money or property belonging to another with intent to deprive the owner of its use or benefit either temporarily or permanently." *Id.* at 102–103. The issue in this case is whether payment by check upon a closed account is

a "wrongful taking", so as to constitute "stealing" as charged in the indictment.

Traditionally, most jurisdictions place bad-check writing within the offense of false pretenses. 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 8.9(a), at 417–18 (1986). They hold that the giving of a check is an implied representation that the drawer has credit at the drawee bank sufficient to cover the amount of the check. *Id.* at 417. Because of the difficulty in applying the crime of false pretenses to the situation where property is obtained by means of a no-account or insufficient-funds check, most if not all states have enacted bad-check legislation creating a new statutory crime separate from, and generally with penalties less severe than, the crime of false pretenses. *Id.* at 416.

Aguilar contends that § 641 does not cover issuance of bad checks, citing *Williams*, where the Supreme Court reversed convictions for making a false statement to a federally-insured bank under 18 U.S.C. § 1014 [1]. Williams was engaged in check kiting, i.e., opening an account with one bank, writing a check on that account for an amount larger than the balance, depositing the bad check with another bank, and drawing cash on the deposited check. *Id.* 458 U.S. at 281–82, 102 S.Ct. at 3089–90. The Court held that writing and depositing the bad checks did not constitute either a "false statement" or "willful overvaluation," as required for convictions under § 1014, and reasoned that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 284, 102 S.Ct. at 3091.[2]

No case has directly applied *Williams* to § 641. This Circuit has applied *Williams* and held in *United States v. Medeles*, 916 F.2d 195 (5th Cir.1990), that the mere presentation of a check which the defendant knows to contain insufficient finds does not amount to a false pretense under 18 U.S.C. § 1344(a)(2). Section 1344(a)(2) punishes one who

> knowingly executes, ... a scheme or artifice— ... (2) to obtain any of the moneys, ... owned be or under the custody or control of a federally chartered of insured financial institution by means of *false* or fraudulent *pretenses*, representations, or promises, ... (emphasis added)

Under both *Williams* and *Medeles*, a presentation of a check on an account with insufficient funds does not constitute a "false representation" or "false pretense" as used in § 1014 and § 1344(a)(2). Significantly, *Williams* and *Medeles* were both based on statutes specifically requiring a "false statement" and a "false pretense[ ]" respectively. Section 641, on which this case is based, does not have language to that effect: § 641 makes it a crime to "steal[ ] ... any ... money, or thing of value of the United States" without explicitly mentioning false pretenses. Therefore, we find this case distinguishable from both *Williams* and *Medeles*, and hold that the common law meaning of false pretenses, contributes to the meaning of the term "steal" in § 641.

In *Boone v. United States*, 235 F.2d 939 (4th Cir.1956), stealing by "false pretenses" under federal statutory interpretation was held to differ from common law theft by "false pretenses." In *Boone*, the defendant had transported a vehicle across state lines after purchasing it with a check he represented to be good but knew to be worthless, and was convicted of violating 18 U.S.C. § 2312, which provided that "[w]hoever transports in interstate ... commerce a motor vehicle ... knowing the same to have been *stolen* shall be ..." guilty of a crime. (emphasis added) The defendant contended his conviction to be error because a "stolen" car was not taken

---

**1.** Section 1014 states, "[w]hoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, ... upon any application, ... or loan, ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

**2.** The Court based its conclusion on the definition of a check in the Uniform Commercial Code. *Id.* at 285, 102 S.Ct. at 3092.

through larceny only. The court affirmed the conviction, reasoning that "while 'stolen' is constantly identified with larceny, the term was never at common law equated or exclusively dedicated to larceny.... Nor in law is 'steal' or 'stolen' a word of art," *Id.* at 940. The court further stated that regardless of what significance the common law, the courts, or the lexicologists have ascribed to "stolen", decisive here is the meaning that the Congress attributed to it. *Id.* at 940–41. The court then concluded that Congress meant to include more than common law larceny in the meaning of the word "stolen". The court affirmed the conviction holding that where an automobile is purchased with a worthless check and transported interstate, it is "stolen" under § 2312.[3]

In *Morissette v. United States*, 342 U.S. 246, 271–73, 72 S.Ct. 240, 254–55, 96 L.Ed. 288 (1952), the Court explained Congress' intent in its wording of § 641:

> It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches.... The purpose which we here attribute to Congress parallels that of codifiers of common law in England and the States and demonstrates that the serious problem in drafting such a statute is to avoid gaps and loopholes between offenses.... (footnotes omitted).

We think that Congress intended the provisions of larceny-type offenses codified under § 641, to include the offense of which Aguilar was charged in this case.[4]

This Circuit has held that a "hot" check can constitute bank theft under § 2113(b), if sufficient evidence, other than the bad check itself, exists to prove intent to steal. *United States v. Khamis*, 674 F.2d 390 (5th Cir.1982). Khamis had deposited a $5,000 check signed by one, Al Morgargest, and withdrew the funds the next day. The government's handwriting expert testified that Khamis wrote everything on the check, except for the signature of Al–Morgargest. On appeal Khamis contended that the evidence did not support the proposition that he intended to steal the $5,000 represented by the check explaining this incident as nothing more than a "deposit of a 'hot check' against which subsequent withdrawals were made." *Id.* at 393. This explanation was rejected by the jury, and this Court refused to disturb the holding for insufficiency of evidence. The Court noted that evidence of intent to steal existed beyond the check itself: (1) a conflicting explanation given by Khamis to the bank when contacted about the dishonored check; (2) the testimony of the handwriting expert that Khamis had written the check; (3) Khamis' denial that he wrote the check; (4) testimony that the address on the check was not Khamis residence but was the English Language Center which Khamis once attended; and (5) evidence reflecting the totality of the check kiting scheme in which this transaction played a part. The *Khamis* court reasoned that, "[t]he jury was entitled to conclude that Khamis' deposit of a worthless check and the withdrawal and use of the funds represented by the check, *in the circumstances presented,* constituted a taking of the $5,000 with intent to steal from the bank, ..." *Id.* at 394 (emphasis added).[5]

In sum, we do not think that *Williams* forecloses Aguilar's conviction for stealing

---

**3.** *Boone* was followed by the Supreme Court in *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), which construed § 2312 in the same manner.

**4.** We are not alone in this conclusion. *See, United States v. Williams*, 946 F.2d 888 (4th Cir.1991) (table—unpublished) (available on WESTLAW).

**5.** After *Williams* was decided, the *Khamis* court reversed the conviction under 18 U.S.C. § 1014, but left undisturbed the § 2113(b) conviction.

In a similar case, the Seventh Circuit applied *Williams* to determine that check kiting could not constitute bank theft under 18 U.S.C. § 2113(b), unless there was evidence of misrepresentations other than "the kited checks themselves." *United States v. Kucik*, 844 F.2d 493, 500 (7th Cir.1988).

government property if the government proves that he knowingly passed a bad check with the intent not to honor it. A "hot" check alone cannot be a false statement under § 1014, but it can be used to convict a defendant under § 641 of theft by false pretenses if the government shows that the defendant intended not to honor the check, thereby proving the element of intent to deprive. Whether the government sufficiently proved Aguilar's intent to deprive the U.S. of its property is the next issue we will address.

## III. AGUILAR'S INTENT

The burden of proof is on the Government to prove each element to the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In determining whether this burden has been successfully discharged, the evidence and all reasonable inferences that may be drawn from the evidence must be viewed in the light most favorable to the Government. *United States v. Prieto–Tejas*, 779 F.2d 1098, 1101 (5th Cir.1986). When reviewing the evidence for sufficiency, this court has stated that it should decide whether a "reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir.1989).

■ Aguilar contends his convictions must be reversed because the government made no showing that he intended to deprive the United States of its property. Aguilar states that in simple state law theft-by-check prosecutions, it must further be shown that he did not intend to pay at the time the check was written. *See e.g., Wilson v. State*, 663 S.W.2d 834, 836–37 (Tex.Crim.App.1984) (en banc). Aguilar asserts that the evidence showed that at the time he wrote the checks, he intended for the checks to be honored by the bank in due course. In his statements to the investigating officers, Aguilar consistently stated that he intended to put money in his account to cover the checks. Aguilar con-

tends that the fact that the account was closed is of no moment because no evidence showed that he knew that the account was closed.

The government asserts that this is not a case in which a defendant wrote checks on an insufficient funds account with the good faith intention to deposit in that account an amount that would cover the checks before they cleared in the normal course of business. The account was closed at the time of issuance of the checks after some five months of inactivity. The bank officer testified that the bank did not send Aguilar an account statement from January 1990 onward because his previous address was not valid, and the bank did not have a forwarding address for him. During the five months of inactivity, the account balance dwindled to $8.14. As of January 12, 1990, the balance was depleted by service charges and the account was closed. The next time Aguilar attempted to access the account was on May 25, 1990 when he wrote the first check to the PX for $329.37, as stated in Count One of the indictment. This check was followed by several other checks amounting to a total of $2,349.69, according to the other six counts in the indictment.[6] Before trial, the Army tried unsuccessfully to collect from Aguilar, who did not pay any amount of money in restitution, even though he claimed that he intended to honor the checks. Moreover, Aguilar admitted to the FBI that he had written the entire series of twenty-two checks when he knew there was no money in the account. The government contends that based on all this evidence, a reasonable jury could infer that Aguilar intended not to honor the checks and, therefore, intended to deprive the government of its property. Especially telling is the number of checks written within a 17 day period with no attempt on Aguilar's part to make offsetting deposits.

We agree and hold that the government presented sufficient evidence from which a reasonable jury could infer that Aguilar did not intend to honor the checks when he wrote them.

---

**6.** Additionally, under FRE 404(b) the government submitted evidence of fifteen other bad checks written on the same closed account by

Aguilar to the PX between May 25, and June 11, 1990.

## IV. COUNT ONE: THE "POST-DATED" CHECK

■ Aguilar contends that his conviction as to Count One must nevertheless be reversed because the evidence at trial clearly showed that the date written on the check was May 25, 1999. (Government's Exhibit 1–A, Record, Vol. 2, pp. 42–44). He argues that a post-dated check cannot constitute an implied representation that the drawer presently has enough in his account to cover the check, which is not even payable until the stated date. *See,* Tex.Bus. & Com.Code Ann. § 3.114(b).

The government responds that the date of the check was an issue before the jury, and "by its finding of guilty in this count, the jury evidently felt that it said '1990'." Government Brief at 10. In light of the appearance of the check itself and the testimony presented at trial[7], no rational jury could have reached this conclusion. Aguilar's conviction as to Count One must therefore be reversed.

For these reasons, we REVERSE the conviction as to Count One and otherwise AFFIRM as to the other counts of conviction.

---

**7.** Markita Jordan, an employee at the Fort Bliss Commissary, testified that the check was "written" on May 25, 1990, but she also admitted that Aguilar wrote "May 25, 1999" on the check. The check itself was viewed as part of this record and clearly shows 1999.