# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 13, 2010

No. 09-31041

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

BARBARA SIMMONS DOWL, also known as Barbara Simmons, also known as Barbara Lee Dowl, also known as Barbara Dowl,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

PER CURIAM:

Following Hurricane Katrina, Barbara Dowl applied for and received funds from the Government to rebuild a home in New Orleans, Louisiana. However, Dowl did not own the property, and she used the money for non-rebuilding expenditures. The Government charged Dowl with five counts related to this fraud, and a jury found her guilty on all counts. Dowl was sentenced to 69 months' imprisonment and ordered to pay $156,761 in restitution. On appeal, she challenges both her conviction and sentence. We AFFIRM.

No. 09-31041

# I.  BACKGROUND

## A.  Factual Background

### *1. The Zimple Street Property*

In 1992, Barbara Dowl ("Dowl") and her then-husband Nathaniel Dowl, Jr., purchased a home and property located at 8633 Zimple Street in New Orleans, Louisiana (the "Zimple Property" or "Property").  The Dowls failed to keep up with their property taxes, and the Zimple Property was adjudicated to the City of New Orleans in 1997.[1]

In 2004, the City of New Orleans sold the Zimple Property to Robinson Ventures, LLC, a small real-estate company owned by Michelle and Braden Robinson.[2]  The Dowls sought to annul this sale, and the Robinsons sought to evict the Dowls from the Property.  The state trial court granted the eviction, and the Dowls filed a writ for review by the Louisiana Supreme Court.  This writ and the Dowls' petition to annul the sale of the Zimple Property were pending when Hurricane Katrina struck in August 2005, severely damaging the home on the Property.  In January 2006, the Louisiana Supreme Court declined to hear the Dowls' writ for review and subsequently denied their motion for reconsideration in March 2006.  Then, in January 2007, the state trial court granted the City's "exception of no cause of action," effectively terminating the Dowls' challenges to the sale of the Zimple Property.

### *2. Dowl's Loan Applications*

#### i.  The Small Business Administration Loan

In October 2005, Dowl applied to the United States Small Business

---

[1]  However, the city did not take possession of the property, and the record does not clearly indicate whether the Dowls continued to live at the property.

[2] We refer to Robinson Ventures, LLC, and Michelle and Braden Robinson collectively as the "Robinsons," unless otherwise noted or made apparent from context.

2

No. 09-31041

Administration (the "SBA") for a "disaster assistance loan" to rebuild a home on the Zimple Property. As part of her application, Dowl claimed to own the Zimple Property, and in support of this claim, she provided the 1992 act of sale documents. The SBA, on the basis of Dowl's application and her supporting documents, approved a $105,000 loan to be disbursed in installments.

Following the initial disbursement, the SBA requested additional information in order to verify that Nathaniel no longer had an interest in the property. In response, Dowl filed a false quitclaim deed, stating that the City of New Orleans had sold the Zimple Property to her for the payment of back taxes. Additionally, she supplied a "conveyance certificate," which indicated that she had not sold the property since 1992, and a document from the City tax assessor's office showing that all taxes on the property were current. The Government showed at trial that the City knew nothing of the quitclaim deed; the conveyance certificate did not indicate any other transactions because it was pulled from the transaction system using a different name for the property; and the property taxes had been paid by the Robinsons, not Dowl. In total, the SBA disbursed $75,000 to Dowl. Dowl did not use these funds to rebuild a home at the Zimple Property, though she made regular monthly payments on the loan.

### ii. The Louisiana Road Home Program Grant

In November 2006, Dowl also applied for a grant from the Louisiana Road Home program ("Road Home").[3] Dowl submitted an application claiming that she was the owner of the Zimple Property and that the home on the property was her primary residence when Hurricane Katrina struck. In support of these claims, Dowl provided the 1992 act of sale and the false quitclaim deed she had presented to the SBA. Dowl also listed the SBA loan on her Road Home

---

[3] "[T]he SBA and Road Home programs are government incentives to return to New Orleans" following Hurricane Katrina. *Bradley v. Allstate Ins. Co.*, 606 F.3d 215, 229 n.10 (5th Cir. 2010).

3

No. 09-31041

application. On the basis of Dowl's application and supporting documents, Road Home approved Dowl for a $132,000 grant to rebuild her home at the Zimple Property. However, following a determination that Dowl had previously received SBA funds for rebuilding her house, the Road Home program wired $46,000 to the SBA, reducing the amount outstanding on Dowl's SBA loan. Dowl acknowledged the transmission of funds to the SBA and received an $85,930 Road Home grant check to rebuild a home at the Zimple Property; she did not use these funds for that purpose.

## B. Indictment, Trial, and Sentencing

In June 2008, a federal grand jury returned an indictment charging Dowl with one count of wire fraud, in violation of 18 U.S.C. § 1343,[4] and one count of theft of Government funds, in violation of 18 U.S.C. § 641.[5] And in early 2009,

---

[4] Section 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

[5] Section 641 provides, in relevant part:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . .

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all

4

No. 09-31041

the grand jury returned superseding indictments, which further charged Dowl with two counts of making false statements to the Government in violation of 18 U.S.C. § 1001[6] and another count of theft of Government funds.

Before trial, Dowl moved to dismiss the wire fraud count, arguing, *inter alia*, that the wire transmission alleged by the Government—the transfer of funds from Road Home to the SBA—was insufficient to sustain the charge. The district court denied this motion, finding that the wire transmission charged was sufficient because "the completion of [Dowl's] scheme depended in part on the wire transfer, [and thus] the transfer was 'incident to an essential part of the scheme.'"

During trial, the Government presented evidence showing that Dowl falsely claimed to own the Zimple Property; made false applications to other entities for assistance following Hurricane Katrina; filed false deeds and real

---

the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 641.

[6] Section 1001 provides, in relevant part:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully —

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

18 U.S.C. § 1001(a).

5

estate documents concerning the Zimple Property; and used the court system to file frivolous litigation challenging the ownership of the Zimple Property, including a suit that alleged corruption against the Robinsons. The Government also detailed the specifics of Dowl's fraudulent applications to the SBA and Road Home and showed that Dowl had used assistance funds for non-rebuilding expenditures.

Following the close of the Government's case, Dowl moved under Federal Rule of Criminal Procedure 29 for acquittal on the theft of the Government funds from the SBA charge. She argued that the Government had not shown any intent to deprive the Government of funds because she intended to pay back the loan and that thus the Government had not shown "theft" in violation of 18 U.S.C. § 641. The district court denied this motion, finding that there was enough evidence to submit the case to the jury. Dowl then presented witness testimony purporting to show that she had rights in the Zimple Property. Dowl failed to renew her Rule 29 motion at the close of all evidence.

The case was submitted to the jury, which found Dowl guilty on all charged counts and also determined that $156,761 should be forfeited to the Government as restitution. Following the verdict, a United States Sentencing Guidelines ("Guidelines") range of 46–57 months' imprisonment was calculated. During sentencing, Dowl argued that the Guidelines' intended loss calculation of $237,000 did not properly credit her for the $46,000 repayment of her SBA loan by Road Home. The district court overruled this objection, concluding that the loan applications established the intended loss and that no credit should be given for the Government's detection of the overlapping funds.

The Government moved for an upward departure from the Guidelines range because it did not accurately reflect the impact on the Robinsons as victims. The district court agreed, finding that Dowl's frauds and use of the court and property filing systems had imposed hardships on the Robinsons. The

No. 09-31041

court upwardly departed by 12 months and sentenced Dowl to 69 months' imprisonment.  Dowl timely appealed.

## II.  DISCUSSION

### A.  Conviction

On appeal, Dowl raises two challenges to her conviction: (1) whether the wire of funds from Road Home to the SBA was sufficient to bring Dowl's fraudulent scheme within the scope of the wire fraud statute and (2) whether there was sufficient *mens rea* evidence produced by the Government to sustain Dowl's conviction on the theft of SBA funds.  We address each in turn.

#### 1. *Wire Transfer*

"'To prove wire fraud under 18 U.S.C. § 1343, the government must prove: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme.'" *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009) (quoting *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2006)).  Here, the Government charged that the relevant wire was the transmission of $46,000 from Road Home in Louisiana to the SBA's account in New York, following the discovery of the overlapping funds.  Dowl contends that this wire was "not for the purpose of executing the alleged scheme to defraud" and thus cannot support her wire fraud conviction.  We disagree.

"We review [a] conviction *de novo* and ask 'whether a reasonable jury could conclude that the relevant evidence, direct or circumstantial, established all of the essential elements of the crime beyond a reasonable doubt when viewed in the light most favorable to the verdict.'" *Id.* (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001)).  The use of wire communications "need not be an essential element of [a scheme to defraud]" but may instead "be incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (citations, alterations, and quotation marks omitted) (discussing the mail fraud statute requirements); *accord United States v. Mills*,

No. 09-31041

199 F.3d 184, 188 (5th Cir. 1999) (per curiam) ("Interstate wire communications [a]re used to further the fraudulent scheme, and federal jurisdiction attaches, if the use of the wires by the banks [i]s incident to an essential part of the scheme."). "To show that a [wire] is incident to an essential part of the scheme, the government must demonstrate that completion of the alleged scheme depended in some way on the information . . . that passed through the [wire]." *Ingles*, 445 F.3d at 835 (quotation marks and alterations omitted) (discussing the mail fraud statute).

The alleged wire supports the wire fraud count, and the evidence presented at trial supports Dowl's wire fraud conviction. Dowl knew that she might have to use some of her Road Home money to pay down her SBA loan. She agreed to this condition through signing her applications, explicitly agreeing to any necessary transfer. *Cf. Mills*, 199 F.3d at 190 ("[Defendant] was not indifferent as to when the scheme was discovered . . . because the continuation of the scheme depended upon the successful deception of [all] parties."). Because Road Home discovered that the SBA loan funds overlapped with its grant, the transfer from Road Home to the SBA was necessary to obtain the balance of the Road Home funds. Dowl accepted this transfer, acknowledging that $46,000 would be remitted to the SBA to pay down her loan, and received the balance of the Road Home funds, $86,000. This transfer of funds was accomplished via an interstate wire transfer.

Dowl's scheme was not complete until she approved the transfer of funds and Road Home distributed the funds to Dowl and SBA. *See United States v. Arledge*, 553 F.3d 881, 892 (5th Cir. 2008) ("[A] scheme to defraud is complete when the persons intended to receive the money had received it." (alterations and quotation marks omitted) (quoting *United States v. Maze*, 414 U.S. 395, 400 (1974))); *cf. Mills*, 199 F.3d at 190 ("[S]uccess of the . . . fraudulent venture depended upon continued harmonious relations among [various entities]."). As

such, the wire transfer from Road Home to the SBA was, at the least, an incidental part of Dowl's scheme to defraud. *See Arledge*, 553 F.3d at 892 (finding that documents that had to be sent prior to release of funds were sent "pursuant to the scheme to defraud"); *cf. Mills*, 199 F.3d at 190 (finding that the wire communications to sustain a fraudulent scheme "were at the heart of the scheme [to defraud]"). The wire transfer was sufficient to support Dowl's wire fraud conviction.

### 2. Mens Rea *Evidence*

Dowl next challenges her conviction for theft of SBA funds, arguing that she lacked the requisite *mens rea* for conviction. Dowl moved for a judgment of acquittal at the beginning of trial, but she failed to renew this motion at the close of evidence. Therefore, we review for a "manifest miscarriage of justice" and will reverse only if "the record is devoid of evidence pointing to guilt or contains evidence on a key element of the offense that is so tenuous that a conviction would be shocking." *United States v. Burton*, 324 F.3d 768, 770 (5th Cir. 2003) (alteration and quotation marks omitted).

Dowl specifically argues that the Government alleged a form of "theft*,"* larceny by trick, that required an intent to permanently deprive the Government of its funds. Dowl contends that the Government did not prove that she intended to permanently deprive the Government because she intended to repay the loans, and thus the Government failed to prove theft of its property under § 641. We are unpersuaded.

In *Morissette v. United States*, the Supreme Court outlined the breadth of 18 U.S.C. § 641, noting that it was enacted "to collect from scattered sources crimes so kindred as to belong in one category." 342 U.S. 246, 266–67 (1952). The Court further recognized that "[t]he history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law *and also acts which shade into those crimes but which, most strictly considered,*

9

*might not be found to fit their fixed definitions.*"  *Id.* at 266 n.28 (emphasis added).

Following on this broad construction, we have determined that the requisite "intent" under § 641 is "the intent to deprive the owner of the use or benefit of the property."  *United States v. Dien Duc Huynh*, 246 F.3d 734, 745 (5th Cir. 2001); *see also United States v. Jones*, 217 F. App'x 333, 336 (5th Cir. 2007) (per curiam) ("The jury instructions defined the term 'steal' as the wrongful taking of money or property belonging to another with the intent to deprive the owner of its use or benefit either temporarily or permanently.  The intent required in § 641 is the intent to appropriate the government property to a use inconsistent with the owner's rights and benefits." (quotation marks and alterations omitted)).

And in *United States v. Aguilar*, we favorably quoted a district court's inclusion of temporary takings within the ambit of "stealing" under § 641: "The district court defined the term 'steal' as 'the wrongful taking of money or property belonging to another with intent to deprive the owner of its use or benefit either temporarily or permanently.'" 967 F.2d 111, 112 (5th Cir. 1992).  Further, in *United States v. Sparkman*, an unpublished opinion which, though non-precedential, is nonetheless persuasive, we rejected the defendant's "argument that the evidence failed to show that he intended to deprive the Government of the funds permanently . . . because the Government was not required to prove a permanent deprivation; a temporary taking also violates the statute."  112 F. App'x 358, 360 (5th Cir. 2004) (per curiam) (citing the FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) § 2.33 (2001) (the "PATTERN JURY INSTRUCTIONS")).  Our sister circuits are in accord with this construction of § 641's required intent.  *See United States v. Rehak*, 589 F.3d 965, 973–74 (8th Cir. 2009) ("In *Morissette*, the Supreme Court recognized that section 641 intended to fill the gaps or crevices on the law on larceny-type

offenses. The statute reaches all instances where one may obtain wrongful advantages from another's property [and] prohibits both permanent and temporary takings." (citations and quotation marks omitted)); *United States v. Howard*, 30 F.3d 871, 875 (7th Cir. 1994) ("There are three elements to the crime of conversion under section 641: '(1) that the money or property belonged to the government; (2) that the defendant fraudulently appropriated the money or property to his own use or the use of others; (3) and that the defendant did so knowingly and willfully *with the intent either temporarily or permanently to deprive the owner of the use of the money or property.*'" (emphasis added) (quoting *United States v. McRee*, 7 F.3d 976, 980 (11th Cir. 1993))); *McRee*, 7 F.3d at 980 (allowing for intent to deprive either "temporarily or permanently" (citing *United States v. Lanier*, 920 F.2d 887, 895 n.62 (11th Cir. 1991))); *Lanier*, 920 F.2d at 895 ("Defendants' intention to repay the $1.8 million, even actual repayment, is not a defense to a charge of embezzlement under section 641, so long as the money was the property of the United States when it was taken.").

We think the district court's use of the PATTERN JURY INSTRUCTIONS here was correct: It was not error to define "steal," for the purposes of § 641, to mean "the wrongful taking of money or property belonging to another with intent to deprive the owner [here, the Government] of its use or benefit either temporarily or permanently." PATTERN JURY INSTRUCTIONS § 2.33. Further, we conclude that the Government submitted ample evidence at trial to support the jury's determination that Dowl intended such a deprivation and did "steal" Government property. Dowl submitted fraudulent applications to obtain the Government's funds and proceeded to use the funds inconsistently with their intended use; this scheme deprived the Government of the funds' economic value for aiding homeowners' rebuilding efforts after Hurricane Katrina. *Cf. United States v. Barnes*, 761 F.2d 1026, 1032 (5th Cir. 1985) (finding sufficient taking of Government funds where Government loan "funds were obtained as a result

of misrepresentations[ by several] borrowers [who] were not qualified for these loans and . . . [who] utilized [the funds] for purposes other than those for which they were intended"). We find no error—much less a "manifest miscarriage of justice"—in Dowl's conviction for violating 18 U.S.C. § 641.

## B. Sentence

Regarding her sentence, Dowl challenges only the district court's intended loss calculation. Dowl argues that if we uphold her conviction on the wire fraud count—finding, in her words, "that Road Home's return of the funds was accomplished jointly with Dowl"—then her "intended loss of $105,000 [regarding the SBA funds] should be reduced by $46,000," thus bringing her total loss under $200,000 and reducing her offense level. We find no sentencing error.

"Calculation of the loss amount and other factual determinations are reviewed for clear error; legal questions about the interpretation of the Guidelines are reviewed *de novo.*" *United States v. Setser*, 568 F.3d 482, 496 (5th Cir. 2009) (citing *United States v. Tedder*, 81 F.3d 549, 550 (5th Cir. 1996)). Section 2B1.1(b)(1)(G) of the Guidelines provides for a 12 level offense level increase "[i]f the loss exceeded . . . $200,000." The application note to this section, which is authoritative, *see Stinson v. United States*, 508 U.S. 36, 38 (1993), states that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). The application note further provides that "'[i]ntended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* cmt. n.3(A)(ii).

Here, Dowl submitted false applications for $237,000 in loans; this intention to divert funds from the Government for unintended uses qualifies the loan application amounts as "intended losses." *See id.* cmt n.3(F)(ii) ("In a case involving government benefits (e.g., grants, loans . . . ), loss shall be considered

to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses."); *accord United States v. Miller*, 316 F.3d 495, 500 (4th Cir. 2003) ("[I]n cases involving government program benefits, loss is the value of the benefits *diverted . . . .*"); *United States v. Kosth*, 257 F.3d 712, 722 (7th Cir. 2001) (district court properly used loan commitment amounts from SBA in calculating whether those funds were "diverted" from intended recipients); *see also United States v. Lane*, 323 F.3d 568, 585 (7th Cir. 2003) ("[I]ntended loss is the amount of money that the defendant places at risk as a result of the fraudulent loan application." (citing *United States v. Downs*, 123 F.3d 637, 643–44 (7th Cir. 1997)).

However, comment 3(E) to the § 2B1.1 application note requires a reduction in the loss amount for funds returned "by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  U.S.S.G. § 2B1.1 cmt. n.3(E)(i).[7]  In *United States v. Austin*, the defendant argued that assets pledged as collateral after detection of a fraud could reduce the loss amount.  479 F.3d 363, 369 (5th Cir. 2007).  In rejecting this argument, we discussed the import of comment 3(E), recognizing a "long-standing, well-recognized rule that post-detection repayments or pledges of collateral do not reduce the loss.  Such payments and pledges are considered at sentencing, but with regard to restitution and acceptance-of-responsibility

---

[7] Specifically, the comment provides that:

Loss shall be reduced by the following . . . .  The money returned, . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. cmt. n.3(E)(i).

reductions." *Id.* (footnotes omitted) (collecting cases). We further noted in *Austin* that:

> The Guidelines use loss as a proxy for the seriousness of the fraud. An offense is generally less serious if the defendant "transfers something of value to the victim(s)." But that "something of value" must be transferred before the fraud is detected. Otherwise, as the Sentencing Commission noted, "it would be inappropriate to credit the defendant" with the value of the transferred assets.

*Id.* (footnotes omitted). Accordingly, we concluded that "assets pledged up until the time the offense is discovered . . . are referable to the context of the transaction because the pledge of assets is not an attempt to buy a sentence reduction *or continue the fraud*, but instead to effectuate a reduction of the actual or intended loss." *Id.* (emphasis added).

Here, as discussed above, we view the return of funds to the SBA as, at the least, incident to Dowl's continuation of her fraud; Dowl had to repay the SBA in order to receive the balance of her Road Home funds. However, the fact that Dowl had to release the funds to continue her fraud is not dispositive. In *Setser*, we noted that this commentary also applied to Ponzi schemes,[8] concluding that the application note "permitted offsetting of payments to investors up to the amount they had invested." 568 F.3d at 497. Accordingly, we concluded that the defendant "was [properly] given credit for money that was returned to investors [in the Ponzi scheme]." *Id.*

The question then is whether to treat the money transferred by Road Home to SBA as an offset to Dowl's intended loss comparable to either amounts repaid by a defendant before a fraud is detected or investment money returned in a Ponzi scheme. We decline to do so.

---

[8] "A Ponzi scheme is an investment swindle in which some early investors are paid off with money put up by later ones in order to encourage more and bigger risks." *Columbia Mut. Ins. Co. v. Fiesta Mart, Inc.*, 987 F.2d 1124, 1125 n.2 (5th Cir. 1993) (citation and quotation marks omitted); *Setser*, 568 F.3d at 486 ("As in a classic Ponzi scheme, as new investments came in . . . , some of the new money was used to pay earlier investors.").

First, as distinguished from cases where credit is given to the defendant for the return of funds, Dowl did not herself return the funds to the SBA. The application note gives credit for funds returned "by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). "The determination of intended loss under the . . . Guidelines . . . focuses on the *conduct of the defendant . . . .*" *Lane*, 323 F.3d at 590; *accord United States v. Geeslin*, 447 F.3d 408, 410–11 (5th Cir. 2006) (quoting § 2B1.1 cmt. n.3(E) and declining to give "loss" credit to defendant for services rendered by co-conspirator when co-conspirator could also be considered a victim). Dowl concedes that she did not return the $46,000 to the SBA, instead arguing that she acted "jointly" with Road Home for the return of these funds. But though Dowl declared the SBA loan on her Road Home grant application, she did not herself remit the Road Home funds to the SBA, instead accepting that some of her stolen Road Home funds had to be used to repay some of her stolen SBA loan funds once the Government detected the overlap. We cannot accept such an interpretation that would permit a fraudfeasor to benefit from the return of funds detected and retrieved largely by the efforts of a defrauded party. *See Austin*, 479 F.3d at 367–69 ("When interpreting the [Guidelines] commentary, we apply ordinary rules of statutory construction. . . . Ordinarily, we will not interpret [the Guidelines] to achieve . . . absurd results."); *cf. Geeslin*, 447 F.3d at 411 ("[Co-conspirator]'s agreement to participate in [defendant]'s scheme to defraud the City does not preclude the district court's determination that [the co-conspirator] was a victim because it was not entirely voluntary.").

Second, we think the fact that Dowl would have received all the funds, had the Government not detected the overlap, distinguishes Dowl's scheme from a Ponzi scheme. To operate a Ponzi scheme, some subsequent investor money *must* be returned to the initial investors. Thus, in such a scheme, the "loss"

calculation is offset by the returned investor funds to better reflect the actual harm imposed on the investors by the scheme. *See Setser*, 568 F.3d at 497 (explaining the sentencing commission's rationale for comment 3(e) as it pertained to Ponzi schemes); *contra, e.g.*, *Lane*, 323 F.3d at 590 ("[T]he unsecured portion of a loan is a common-sense estimate of the interim risk faced by the lending institution . . . . The intended loss therefore is . . . the amount of the . . . loan . . . less the [assets pledged to secure the loan]." "This determination also applies even when the amount at risk was not lost." (citation and quotation marks omitted)).

Dowl's scheme, on the other hand, did not, in its design, necessarily require the funds transfer from Road Home to the SBA. Instead, Dowl applied for $132,000 in Road Home funds with the knowledge that she *might* have to repay overlapping funds to previous funding sources; the fact that the Government did detect this overlap and did require the transfer of funds does not ameliorate the scope of Dowl's intended fraud. *Cf. Austin*, 479 F.3d at 369 ("[There is a] long-standing, well-recognized rule that post-detection repayments . . . do not reduce the loss."). We will not construe the Guidelines to give credit to Dowl for the detection and required repayment of overlapping funds by the Government—the defrauded party. We discern no error in Dowl's sentence.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of conviction and sentence.

AFFIRMED.