# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 23, 2012

No. 11-50444

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

SAMUEL ARTURO ACOSTA-RUIZ,

Defendant–Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:10-CR-349-2

Before KING, PRADO, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellant Samuel Arturo Acosta-Ruiz ("Acosta") was convicted by a jury of transporting illegal aliens in violation of 8 U.S.C. § 1324(a). Acosta raises two issues on appeal: (1) a sufficiency of the evidence challenge to his conviction for the substantive crime of transporting illegal aliens and (2) a Confrontation Clause challenge to the Government's presentation of the videotaped depositions of the two aliens Acosta was charged with transporting. Because we find neither basis presents reversible error, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-50444

## I.  BACKGROUND

### A.    Factual Background

Acosta began his journey on February 7, 2010 by taking a bus for twelve hours from Dolores Hidalgo, Guanajuato, Mexico to Guerrero, Coahuila, Mexico with twenty-seven other aliens seeking to be smuggled into the United States by a guide he had paid (known as a "coyote").  Once the group, including the guide, arrived in Guerrero on February 8, they rested until nightfall.  The guide had told Acosta and the others to pack food for only one day because the plan was for a confederate in the United States to pick the group up and drive them to Dallas after one day of walking through the brush.  Things did not, however, go as planned.  The guide got lost and the group ended up walking in circles for about nine hours per day for four days.  On the fourth day in the brush, Acosta along with four other aliens decided to break away from the larger group.

After wandering for about three hours, the five-person group came upon an abandoned trailer, wherein they found water and a map of the area.  Consultation with the map led the group to the conclusion that they were near Carrizo Springs, Texas.  At this point, Acosta used the cell phone he had been carrying with him to call his common-law wife in Dallas to have her come pick him up. She agreed.  During this conversation, Acosta mentioned nothing about the four others in his group.  Acosta allowed the four others use of his cell phone to try to contact people who could pick them up, but all of the other four were unsuccessful at reaching anyone.

With Acosta being the only one able to secure a ride, the other four asked Acosta to take them with him.  Initially, Acosta refused to answer them.  During the six hours Acosta waited for his wife to arrive, the four continued to ask and pressure Acosta into allowing them to come with him.  When his wife was about an hour away from Carrizo Springs, Acosta phoned her again.  It was in that conversation that Acosta first disclosed that there were others with him.  When

2

No. 11-50444

Acosta's wife arrived, Acosta agreed to take the four others to Austin, Texas. Two of the four men got into the trunk of Acosta's wife's hatchback SUV and two others got into the backseat. Acosta got into the passenger's seat, and his wife drove away. Acosta later testified that he only acquiesced because he was worried about the bad physical condition that he perceived the four others to be in, but also admitted that he never considered taking the others to a hospital, stopping for food, or calling the police.

After driving for about twenty minutes, the car carrying Acosta, his wife, and the other four members of the breakaway group was stopped by Crystal City, Texas police. The police officers contacted the United States Border Patrol because they suspected alien smuggling. Border Patrol agents responded and took Acosta, his wife, and the others to the Carrizo Springs station where Agent Armando Ontiveros conducted an interview with Acosta in Spanish, during which Acosta told Ontiveros about how he came into the United States illegally with the other four and eventually came to have them in his wife's car.

## B.　Procedural Background

Acosta and his wife were both charged with two counts of transporting illegal aliens and one count of conspiring to transport illegal aliens in violation of 8 U.S.C. § 1324(a). Two of the four aliens that Acosta was charged with transporting were removed to Mexico, and two others—Juan Osvaldo Lopez-Garcia ("Lopez") and Jose Gabriel Mendez-Parra ("Mendez")—were detained as material witnesses and deposed pursuant to 18 U.S.C. § 3144. After the Government took Lopez's and Mendez's depositions (with Acosta's counsel present), the Government began expedited removal of Lopez and Mendez. During their depositions, Lopez and Mendez were advised that they might be needed for trial and, if so, that the Government would grant them permission to reenter the United States for this purpose and pay for their travel expenses. They were asked to provide an address and telephone number where they could

be reached in Mexico, which they did.  Additionally, according to the prosecutor's representations at a later hearing, Lopez and Mendez were given letters in English and Spanish, which included the name and telephone number of a Border Patrol agent who would meet them at Del Rio, Texas port of entry to help them reenter the United States for trial.  Lopez and Mendez were returned to Mexico on April 15, 2010.

On October 13, 2010, the district court issued an order setting the case for trial on November 30, 2010.  Two weeks prior to trial, the Government filed a motion to declare Lopez and Mendez unavailable and to allow for the introduction of their videotaped depositions at trial.  The Government argued that despite its best, reasonable efforts, it had been unable to secure the witnesses' presence at trial.  Specifically, it noted in its motion that Border Patrol agents had unsuccessfully attempted to contact Lopez and Mendez by telephone on ten occasions between April and November 2010.  The Government also stated that it had mailed subpoenas to the addresses provided by Lopez and Mendez advising them that their presence was needed at the trial and that their travel expenses would be paid.  At the hearing on the motion, the prosecutor explained that Lopez and Mendez were not served with subpoenas at their depositions because the trial date had not been set and that he had no proof that the letters and subpoenas notifying Lopez and Mendez of the trial date had been received by the witnesses, noting that one of the letters had been returned as undeliverable.  After an objection, the Government offered to call Border Patrol Agent Jonathan Anfinsen to testify about his efforts in locating Lopez and Mendez, but the district court stated that it was "factually satisfied" with the Government's efforts and declared Lopez and Mendez unavailable.

During Acosta's jury trial, the Government played the videotaped depositions of Lopez and Mendez, in addition to calling two Border Patrol agents as witnesses.  Acosta also testified in his own defense.  The jury found Acosta

No. 11-50444

guilty as charged.  The district court sentenced him to concurrent terms of sixteen months of imprisonment, with credit for time served, and concurrent terms of three years of supervised release.  Acosta timely appealed.

## II. DISCUSSION

### A.    Sufficiency of the Evidence

Under § 1324(a),[1] the Government must establish that: "(1) an alien entered or remained in the United States in violation of the law, (2) [the defendant] transported the alien within the United States with intent to further the alien's unlawful presence, and (3) [the defendant] knew or recklessly disregarded the fact that the alien was in the country in violation of the law." *United States v. Nolasco-Rosas*, 286 F.3d 762, 765 (5th Cir. 2002); 8 U.S.C. § 1324(a)(1)(A)(ii).  Specifically, Acosta contends that the Government failed to meet its burden on the second element—move/transport.  Although Acosta moved for a judgment of acquittal at the close of the Government's case-in-chief, he failed to renew that motion at the close of all the evidence or file a post-verdict motion.  Therefore, our review is for a "manifest miscarriage of justice."[2] *United States v. Dowl*, 619 F.3d 494, 500 (5th Cir. 2010).  Under this standard, reversal is only warranted "if the record is devoid of evidence pointing to guilt or contains evidence on a key element of the offense that is so tenuous that a conviction would be shocking." *Id.* (internal quotation marks omitted).

---

[1] The statutory text of 8 U.S.C. § 1324(a)(1)(A)(ii) criminalizes the conduct of "any person who knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law."

[2] As we clarified recently in *United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) (en banc), the articulation of the standard of "manifest miscarriage of justice" is a short-hand "restatement" of the familiar plain-error standard of review in the context of "forfeited insufficiency claims." *Id.* at 331 & n.9; *see also Puckett v. United States*, 556 U.S. 129, 135 (2009).

No. 11-50444

The most common conduct that would give rise to culpability for transporting illegal aliens is a situation where the defendant who is charged with violating § 1324(a) is the one driving the vehicle with the illegal aliens. *See, e.g.*, *United States v. Tirado-Tirado*, 563 F.3d 117 (5th Cir. 2009). But the statute is obviously broader than this common fact pattern. In fact, our cases reflect that the second element turns on the defendant's control of the means of transportation.

In *United States v. Pineda-Jimenez*, 212 F. App'x 369 (5th Cir. 2007), a case with similar facts to Acosta's, we explained that "[a]lthough [the defendant] was not driving at the time of the stop, the jury could infer that he was in *control* of the operation." *Id*. at 372 (emphasis added); *cf. United States v. Calderon-Lopez*, 268 F. App'x 279, 287 (5th Cir. 2008) (upholding an aiding-and-abetting conviction where defendant was "in charge of the operation"). There, as here, the Government charged both the driver and the passenger of a truck with transporting illegal aliens, and we affirmed both convictions. *Pineda-Jimenez*, 212 F. App'x at 372–73. The evidence of control/leadership against the passenger in that case (Rivas-Alvarez) was that passenger was "carrying a large amount of cash" and the "vehicle had been modified in a manner conducive to smuggling." *Id*. at 372. In light of our precedent and under a "manifest miscarriage of justice" standard of review, we cannot say that the record against Acosta, who arranged the transportation and acquiesced to taking the others to Austin, is devoid of evidence from which the jury could infer control and therefore meet the second element of § 1324(a).

## B.   Confrontation Clause

The Confrontation Clause "bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Tirado-Tirado*, 563 F.3d at 122 (5th Cir. 2009) (quoting *Crawford v. Washington*,

6

No. 11-50444

541 U.S. 36, 53–54 (2004)).    A witness is considered unavailable for Confrontation Clause purposes if "the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (internal quotation marks omitted), *overruled on other grounds by Crawford*, 541 U.S. at 60–68; *see also Tirado-Tirado*, 563 F.3d at 123 n.3 (noting that *Crawford* did not change the definition of unavailability for Confrontation Clause purposes and that pre-*Crawford* cases on this point remain good law). The Government "bears the burden of establishing that a witness is unavailable." *Tirado-Tirado*, 563 F.3d at 123.    The good-faith effort inquiry is "identical to the unavailability inquiry under [Federal] Rule [of Evidence] 804(a)(5)." *Id*. at 123 n.4; *see* Fed. R. Evid. 804(a)(5)(A) (A witness is unavailable if he "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure [his] attendance."). The effort required by the Government to procure a witness is, at base, "a question of reasonableness." *United States v. Aguilar-Tamayo*, 300 F.3d 562, 565 (5th Cir. 2002).

Acosta raises two arguments with respect to the Confrontation Clause. First, he contends that it was improper for the district court to rely on the Government's representations in its motion and at the hearing to establish that it had made a good-faith effort to procure Lopez's and Mendez's presence at trial. Second, he contends that, even accepting the Government's representations, the Government insufficiently proved that it had made a good-faith effort under our precedents.

We generally review Confrontation Clause challenges de novo, subject to harmless error review. *United States v. Cantu-Ramirez*, 669 F.3d 619, 631 (5th Cir. 2012).    "An error is harmless if this court after a thorough examination of the record is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *United States v. Barraza*, 655 F.3d

No. 11-50444

375, 382 (5th Cir. 2011) (internal quotation marks omitted). Even assuming *arguendo* that Acosta's contentions amount to error,[3] we conclude, beyond a reasonable doubt, that absent the playing of Lopez's and Mendez's videotaped deposition testimony during trial, the jury would have nonetheless found Acosta guilty.

Review of the trial transcript reveals that the only issue Acosta contested was whether by agreeing to let Lopez and Mendez ride with him and his wife before dropping them off in Austin he was transporting them *in furtherance of* their unlawful presence in the United States. Acosta's principal defense was that he agreed to take Lopez, Mendez, and the other aliens only because the others were in dire straits. Agent Sergio Garay testified, however, that, when he first saw the aliens after their car had been stopped by police, they looked "just like any other illegal aliens walking through the brush. . . . [Y]ou could tell they were tired, but not to where they needed medical assistance." Agent Ontiveros similarly testified that the aliens did not appear to be exhausted, did not appear weak, and did not ask for water or medical attention. Although Acosta testified that the breakaway group was weak, in explaining why he eventually acquiesced to taking them, he stated that he felt bad for them and was worried about them. While such testimony could support Acosta's version of events, it also suggests the possibility that after four days of wandering he felt

---

[3] Although we do not reach the issue of whether the Government can rely on the representations of its attorney to establish its good faith in procuring a witness's testimony for Confrontation Clause purposes, we note that such reliance is extremely disfavored. Because review of a Confrontation Clause challenge is de novo, *Cantu-Ramirez*, 669 F.3d at 631, and often the question of the reasonableness of the Government's efforts is very fact-intensive, *see, e.g., Tirado-Tirado*, 563 F.3d at 124–25; *Calderon-Lopez*, 268 F. App'x at 289; *United States v. Allie*, 978 F.2d 1401, 1403, 1407 (5th Cir. 1992), a combined lack of testimony and/or documentary evidence entered into the record presents great practical difficulties for us as a reviewing court. As it is the Government's burden to establish that a witness is unavailable, *Tirado-Tirado*, 563 F.3d at 123, introduction of the letters and/or subpoenas sent to the witnesses as well as testimony of or an affidavit from the case agent discussing other measures taken is strongly encouraged.

No. 11-50444

he "could not just leave them" because of their slim chance of escaping the brush undetected. Moreover, when Acosta's testimony is coupled with the facts elicited by the Government that Acosta did not offer the other aliens any water once inside his wife's car (though the record reflects that Acosta did drink some) and that the destination for dropping off the others was Austin (over three hours away) and not a hospital, the only conclusion that could be drawn was that Acosta's transportation was with the intent to further their unlawful presence. Therefore, any error that Acosta asserts is harmless.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM.